CERBERUS INTERNATIONAL, LTD., Cerberus Partners, L.P., Pequod Investments, L.P., and Ultra Cerberus, Ltd., Plaintiffs Below, Appellants,

v.

APOLLO MANAGEMENT, L.P. and Mobile Technology, Inc., Defendants Below, Appellees.

No. 131, 2001.

Supreme Court of Delaware.

Submitted: Nov. 27, 2001.
Decided: March 13, 2002.

Ronald A. Brown, Jr., of Prickett, Jones & Elliott, Wilmington, Delaware, for Appellants.

Lawrence C. Ashby, and Richard D. Heins, of Ashby & Geddes, Wilmington, Delaware; Charles E. Bachman (argued), and James L. Burns, of O'Sullivan, Graev & Karabell, LLP, New York City, of counsel, for Appellees.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

This case involves a merger agreement that plaintiffs seek to reform based upon an alleged mistake of fact in the drafting of the agreement. We review the judgment of the Court of Chancery granting defendants' motion for summary judgment and dismissing the complaint. The Court of Chancery determined that there were no material issues of fact that would enable any reasonable finder of fact to conclude that there was clear and convincing evidence of a mutual mistake of fact entitling the plaintiffs to reformation of the merger agreement.

We hold that the trial court erred in granting summary judgment. We find that there was a triable issue of material fact of mutual mistake or unilateral mistake coupled with knowing silence, even considering the plaintiffs' ultimate burden at trial to prove its case for reformation by clear and convincing evidence. Accordingly, we reverse the judgment of the Court of Chancery and remand for further proceedings consistent with this Opinion.

## *Facts*

This case concerns an acquisition in which Apollo Management, L.P. ("Apollo") acquired Mobile Technology, Inc. ("MTI"), both defendants below and appellees. Plaintiffs-appellants (collectively "Cerberus") constitute a stockholder group that controlled MTI until the time of the acquisition. Cerberus brought this action in the Court of Chancery seeking reformation of the merger agreement or a declaratory judgment in its favor.

Apollo entered into a merger agreement with MTI. Under this agreement, MTI was to merge into MTI Acquisition Corp. The new entity would then become a wholly-owned subsidiary of Alliance Imaging, Inc., an affiliate of Apollo.

The initial correspondence between the two companies tends to shed light on their intentions going into the merger negotiations. Apollo offered to acquire MTI for $65 million in a November 14, 1997 letter. MTI's CEO, Joseph W. Cilurzo, responded by letter dated November 19, 1997, reiterating that Apollo's offer was for $65 million and stating that MTI would be "pleased to discuss such a transaction based upon the following conditions . . . ." One of the conditions in this 1½ page letter was that "$3 million [from the exercise of outstanding warrants to purchase stock in MTI] shall be paid to the existing stockholders of [MTI]."[1] On December 1, 1997, Joshua J. Harris, CEO of Apollo, faxed a copy of Cilurzo's November 1997 letter back to MTI with the handwritten notation, "This looks fine."

Thereafter, in a November 26, 1997 letter, Cilurzo wrote, "We feel that it is important to ensure that we have a common understanding of the issues discussed in [a November 24] conversation, and therefore, have documented the key points below." There were six key points. The first stated that "Apollo is interested in acquiring all of MTI's equity for $65 million in cash . . . ." The third stated that "Apollo understands and agrees that the proceeds of warrant and stock purchase plans accrue to the benefit of the current stockholders." Divided among existing stockholders, the $65 million purchase price would have equaled approximately $56.70 per share of MTI. Thus, the total purchase price for MTI would have been $65 million minus transaction costs plus proceeds from sales of options and warrants.

After apparently agreeing in principle on the merger, Apollo and MTI proceeded to draft a merger agreement. Our review of the record suggests that the merger agreement, in pertinent part, was drafted as follows. Apollo's counsel, O'Sullivan, Graev & Karabell, LLP, prepared the first draft. Thereafter, drafts were exchanged. Section 2.1(a)(iii) of the final draft of the merger agreement (dated January 13, 1998) provides that the owner of each "Merger Share" would receive an amount in cash equal to the "Merger Consideration." The "Maximum Closing Merger Consideration," a number needed to calculate the Merger Consideration, was $65 million less transaction expenses. The Merger Consideration was the Maximum Closing Merger Consideration divided by the number of shares outstanding, "assum-

---

1. Certain stockholders in MTI possessed warrants or participated in equity plans, both of which gave them the right to purchase stock in MTI at a given exercise price. For example, there were 30,000 outstanding Series A Warrants with an exercise price of $19.30. Thus, MTI expected to receive a total of $579,000 (30,000 @ $19.30) from the exercise of these warrants. MTI's value as a company was thus greater by $579,000, and so it was rational for MTI to expect the purchase price an acquiror would pay for it to increase proportionately.

ing that all Shares issuable upon the exercise or conversion of any Company Stock Option, Warrant or convertible security and all shares of phantom stock (or any similar security) have been converted into Shares." The definition of "Merger Share," however, was "the Shares that are issued and outstanding . . . ."

Although the parties made a number of changes to the various drafts of the merger agreement, they never changed how the merger agreement treated the proceeds from the sale of options and warrants. There is no evidence in the record before us that the parties renegotiated or discussed renegotiation of either the base $65 million purchase price or the principle that the proceeds of the options and warrants would go to MTI's stockholders.

Thus, the record appears to suggest that, instead of increasing the price MTI's stockholders would receive, the existence of the options and warrants counted *against* this price. This happened in two steps. First, the Maximum Closing Merger Consideration, the cash available to be distributed to the stockholders, did not count the proceeds from the sale of options and warrants that would have come in after the merger. The Maximum Closing Merger Consideration thus apparently undervalued MTI by $3 million. Second, the definition of Merger Consideration divided the Maximum Closing Merger Consideration by an apparently inflated number of stockholders, counting unissued options and warrants as if they had been issued. The actual pool of stockholders receiving the Merger Consideration, however, appears to have included only those who actually had been issued *shares.* These stockholders were not merely holders of options or warrants. Thus, instead of receiving a total of approximately $65 million (or $56.70 per share), a rational finder of fact could conclude on this record that

MTI stockholders received $58 million (or $54.15 per share). If so, rather than receiving a purchase price of $65 million minus transaction costs plus options and warrants proceeds, these stockholders were to receive $65 million minus transaction costs *minus* options and warrants proceeds.

In connection with the merger, MTI solicited the consent of its stockholders. In the Consent Solicitation Statement, MTI mentioned the $65 million purchase price. It also represented that its stockholders would each receive $56.70 per share. Apollo admits on appeal that this $56.70 figure is "consistent with Plaintiff's claimed 'other' agreement."

The deposition testimony tends to shed light on the beliefs of MTI and Latham & Watkins, counsel for MTI in the merger negotiations. There were two lawyers from Latham & Watkins who were primarily involved in the matter. Bryant Edwards was the partner in charge, and Richard Davis was the primary day-to-day lawyer running the transaction.

Cilurzo testified in his deposition that Davis was told to incorporate into the merger agreement the points set out in Cilurzo's November 26 letter. He testified specifically that Davis was to include the proceeds of the options and warrants as part of the purchase price. There was not, however, in the summary judgment record, any discussion of the options and warrants proceeds during the merger negotiations.

James Pike, Vice President and Treasurer of MTI, testified that he was "having trouble with these terms" and that Davis "kind of walked me through how it was supposed to work, and I was satisfied with that explanation." There is no evidence in this record, however, that they specifically discussed the proceeds from the sale of the options and warrants. Both Pike and

Joyce Johnson–Miller, Cerberus' representative for the negotiations, admitted that they did not see anything in the merger agreement that allocated the options and warrants proceeds to MTI's stockholders. Johnson–Miller also admitted that "there's no binding agreement on the parties until the negotiations are done and everybody signs."

On March 4, 1998, Cilurzo, Pike and Davis had a conference call in which they calculated the merger price to be included in the consent solicitation. Cilurzo's notes from that call indicate that the purchase price was to be calculated by adding the proceeds from options and warrants sales to the $65 million price, then subtracting transaction expenses. Cilurzo testified that, during the course of the call, Davis never stated that the proceeds from the options and warrants would not go to MTI's stockholders. Pike also testified that Davis had never told them that MTI stockholders would not receive the proceeds.

The recollections of Bryant and Davis at their depositions was somewhat different from that of MTI's executives. Bryant testified in his deposition that he was not aware of any agreement between MTI and Apollo giving the proceeds of the options and warrants to MTI's stockholders. He also testified that, from the first draft of the merger agreement until closing, no one from MTI or Cerberus told him that they expected that the proceeds would be paid to MTI's stockholders. Davis also testified that MTI had no agreement with Apollo regarding the proceeds and that no one instructed him otherwise from the time of the first draft of the agreement. This is a factual conflict on a material point that a trier of fact could find to be important, and which conflict should be resolved at a full trial.

Apparently, it was only *after* the merger closed that MTI and Cerberus learned of the effect of the merger agreement. The merger closed on March 12, 1998. On March 17, Pike learned that Apollo was planning to pay less than the $65 million initially agreed upon. Cilurzo testified that he and Pike called John Scott of the O'Sullivan firm, who informed them for the first time of the belief of the O'Sullivan firm and its client, Apollo, that the merger agreement counted the options and warrants proceeds against the purchase price.

Cilurzo also documented the events surrounding this discovery in a chronology of events dated April 16, 1998. Cilurzo testified that he and Pike called Davis to tell him of the discrepancy, and that Davis became irate, accused Scott of trying to "cheat" MTI's stockholders, and stated that "only one very narrow interpretation" of the merger agreement justified such a price.

Davis later called Cilurzo back to relate that he still read the merger agreement as giving MTI's stockholders the options and warrants proceeds, but that Bryant read it the "other" way, and that MTI would be dealing with Bryant from then on. Cilurzo's notes indicate that on March 18, one day later, Bryant offered "to pay something up to $50,000 for another attorney, as a gesture, to get this issue settled."

The testimony regarding Apollo's belief at the time is conflicting. A valuation analysis dated December 19, 1997, four days after the first draft of the merger agreement, shows that Apollo thought the "purchase equity" for MTI would be "65.0." A Salomon Smith Barney opinion on the fairness of the merger dated January 12, 1997, refers to the "Consideration" as "$65 million equity." On December 24, 1997, Apollo and MTI entered into an exclusivity agreement. The letter from Apollo recording this fact "confirms that

Apollo Management, L.P. (*'Apollo'*) is still contemplating a purchase price of $65 million for all of the equity of Mobile Technology, Inc. (the *'Company'*)."

There was no testimony in the summary judgment record that Apollo ever told MTI that it was going to pay less than $65 million or that Apollo told MTI that the proceeds from the options and warrants would not go to MTI's stockholders. Joshua Harris, Apollo's CEO, testified that "my understanding of the warrant and option proceeds was that ... we would keep them," that "[t]hat is what was reflected in the merger agreement," and that "that was the transaction that we were willing to offer to MTI." Scott Kleinman, also a representative of Apollo, agreed that there was an "intentional decision ... to write the merger agreement ... so the option/warrant proceeds would go to MTI, the company, rather than the MTI shareholders ...."

Cerberus sued both MTI and Apollo in the Court of Chancery, seeking either reformation of the merger agreement or a declaratory judgment interpreting it to give MTI's former stockholders the proceeds from the sales of options and warrants. The Court of Chancery granted Apollo's summary judgment motion on the declaratory judgment count on November 2, 1999.[2] On March 13, 2001, the Court of Chancery granted summary judgment as to Cerberus' remaining count, ruling that Cerberus had no reasonable prospects of proving its mutual mistake claim at trial.[3]

Cerberus appealed to this Court from the final order and judgment of the Court of Chancery entered on March 21, 2001.[4]

### Trial Court Standard of Review on Summary Judgment in Reformation Cases

The final order and judgment of the Court of Chancery entered on March 21, 2001,[5] is based upon the decision embodied in the transcript of the trial judge's three-page bench ruling of March 13, 2001.[6] The trial court concluded that "given the evidentiary standard that parties seeking reformation must satisfy, I must conclude that on this record that the showing that must be made to overcome this motion for summary judgment simply has not been made ...."[7] The trial court concluded that "while there is some evidence as to what plaintiffs believed the deal was, there is no clear and convincing evidence."[8]

The trial judge also found that on the summary judgment record in this case there was no evidence from which one can "draw an inference that there will be clear and convincing evidence at a trial, that the parties reached an agreement that the proceeds of the option and warrant exercise would be paid to the selling stockholders."[9] The Court of Chancery concluded that there was no evidence in the summary judgment record "from which one can infer that the attorneys representing both sides were incapable of reading the agreement or mistaken as to what the agreement provided on the narrow question of who

---

2. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* Del.Ch., C.A. No. 16425 (Nov. 2, 1999). No appeal from this order was sought.

3. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* Del.Ch., C.A. No. 16425 (Mar. 13, 2001).

4. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* Del.Ch., C.A. No. 16425 (Mar. 21, 2001).

5. *Id.*

6. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* Del.Ch., C.A. No. 16425 (Mar. 13, 2001).

7. *Id.* at 3.

8. *Id.* at 4.

9. *Id.*

would receive the proceeds of the exercise of the options and warrant."[10] The trial court found that this latter issue is a "critical inference the Court would have to make in order to conclude that there exists a triable issue on the reformation claim."[11]

The decision of the Court of Chancery raises two main issues that are before us on this appeal. The first issue is the standard of review the trial court should apply on summary judgment in a reformation case. The second issue is whether the Court of Chancery properly applied that standard of review to the facts in the record here in its determination that there was no triable issue of material fact. In this section we deal with the first issue. In the final section we deal with the second main issue.

■ The first question is one of law.[12] The Court of Chancery concluded that: (1) "[W]hile there is some evidence as to what plaintiffs believed the deal was, there is no clear and convincing evidence;" and (2) "Nor can one draw an inference that there will be clear and convincing evidence at trial."[13] Cerberus contends that the Court of Chancery applied an erroneous legal standard. Cerberus argues that, so

long as they was *some* evidence to support its claim, the Court of Chancery was bound to rule that summary judgment was inappropriate. Apollo argues that the Court of Chancery was correct in holding that, even if Cerberus put forth *some* evidence in support of its claim, summary judgment was appropriate if no reasonable finder of fact could conclude that the evidence proffered on the summary judgment record was clear and convincing.

■ Some courts apply the substantive burden of proof at the summary judgment stage. Others do not. The leading case articulating the impact of the substantive burden of proof on summary judgment is *Anderson v. Liberty Lobby, Inc.*[14] In that case, the United States Supreme Court ruled that a trial court could indeed take the substantive evidentiary standard into consideration when ruling on a summary judgment motion.[15]

Although this Court has cited *Liberty Lobby* favorably in the past,[16] we have never had occasion to consider adopting its main holding. Other jurisdictions have split on the question of whether to adopt the *Liberty Lobby* standard. Many states have adopted it,[17] and it appears to be the

10. *Id.*

11. *Id.*

12. *See MCA, Inc., S'holder Litig. v. Matsushita Elec. Indus. Co.*, 785 A.2d 625, at 638 (Del. Supr.) ("A claim that the trial court employed an incorrect legal standard ... raises a question of law that this Court reviews de novo.").

13. *Cerberus*, at 4.

14. 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

15. *Id.* at 257, 106 S.Ct. 2505.

16. *See, e.g., United Vanguard Fund v. Takecare, Inc.*, 693 A.2d 1076, 1080 & n. 15 (Del. 1997) (citing *Liberty Lobby* favorably in a footnote); *Arnold v. Soc'y for Sav. Bancorp.*, 650

A.2d 1270, 1284 (Del.1994) (citing *Liberty Lobby* for the much less controversial proposition that factual disputes must be "material" to get past summary judgment); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del.1991) (citing *Liberty Lobby* in the context of the plaintiffs' "complete failure of proof").

17. *E.g., Hoch v. Allied–Signal, Inc.*, 24 Cal. App.4th 48, 29 Cal.Rptr.2d 615, 620–21 (1994); *Claytor v. Owens–Corning Fiberglas Corp.*, 662 A.2d 1374, 1381 (D.C.1995); *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 603 A.2d 1357, 1360–61 (Ct. Spec.App.1991); *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 575 N.E.2d 1107, 1110 (1991); *Bob Useldinger & Sons v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993); *Cong Vo Van v. Grand Casinos of Miss., Inc.*, 767 So.2d 1014, 1023 (Miss.2000).

majority rule.[18] Some states have explicitly rejected it in favor of the traditional standard,[19] which is that a trial court need only ask "whether the affidavits have created a genuine issue of material fact," not whether they do so "in light of the burden of proof . . . ."[20]

■ We believe the common sense approach is consistent with *Liberty Lobby*. Accordingly, we hold that the trial court must determine whether the plaintiffs on the summary judgment record proffered evidence from which any rational trier of fact could infer that plaintiffs have proven the elements of a prima facie case by clear and convincing evidence.[21]

■ An analogy to the criminal jurisprudence is apt.[22] The prosecution's case will survive a motion for judgment of acquittal and must be presented to the jury if *any* rational juror could find, from the evidence and inferences therefrom, in the light most favorable to the state, that the defendant is guilty beyond a reasonable doubt.[23] It is not permissible for the trial judge, in either a criminal case or a civil case (regardless of the ultimate substantive burden), to weigh the evidence or to resolve conflicts arising from pretrial documents, affidavits, depositions or other evidence.[24] That is the job of the trier of fact (whether it is to be a bench trial or a jury trial) after hearing *all* the evidence, including live witness testimony that, as here, may be in conflict. This is an axiom of the judicial process[25] and applies unless the parties have stipulated that the paper record shall constitute the trial record.[26]

18. *Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 421 (Tex.2000) ("Adopting the clear-and-convincing standard at the summary judgment stage ... would ... align Texas practice with most other states.").

19. *E.g., Berner v. Caldwell*, 543 So.2d 686, 688 (Ala.1989); *Moffatt v. Brown*, 751 P.2d 939, 943 (AK1988); *5G's Car Sales, Inc. v. Florida Dept. of Law Enforcement*, 581 So.2d 212, 212 (Fla.Dist.Ct.App.1991); *Chester v. Indianapolis Newspapers, Inc.*, 553 N.E.2d 137, 141 (Ind.App.1990); *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 482 (Ky.1991); *DePrimo v. Lehn & Fink Prods. Co.*, 223 N.J.Super. 265, 538 A.2d 461, 463 (L.1987); *Bartlett v. Mirabal*, 128 N.M. 830, 999 P.2d 1062, 1070 (Ct.App.2000); *Jones v. GMC*, 325 Or. 404, 939 P.2d 608, 615 (1997); *Huckabee*, 19 S.W.3d at 421; *Parker v. Haller*, 751 P.2d 372, 376 (Wyo.1988).

20. *De Primo*, 538 A.2d at 463.

21. *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. 2505 ("The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.").

22. *Id.* at 252, 106 S.Ct. 2505 ("[T]his [inquiry] is no different from the consideration of a motion for acquittal in a criminal case. . . .")

23. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Gronenthal v. State*, 779 A.2d 876, 879–80 (Del. Supr.2001); *Williams v. State*, 539 A.2d 164 (1988).

24. *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. 2505.

25. *See, e.g., Continental Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. Supr.1969) ("The function of a judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight."); *Bethea v. Applebee's, Inc.*, 2000 U.S. Dist. Lexis 1456, at *4 (W.D. Mich.) (holding that there were questions of fact that "can only be fairly answered after the fact finder has had an opportunity to hear live testimony from witnesses and weigh their credibility."); *Finney v. Madico, Inc.*, 42 Mass.App.Ct. 46, 674 N.E.2d 655, 657 (1997) ("If, on the summary judgment materials, there are [material disputes of fact], then a finder of fact must weigh the credibility of [the witnesses], and the case ceases to be a candidate for summary judgment.").

26. *See Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del.Supr.1988) (holding that "cross-motions for summary judgment are not the procedural

 The question is whether *any rational* finder of fact could find, on the record presented to the Court of Chancery on summary judgment viewed in the light most favorable to the non-moving party, that the substantive evidentiary burden had been satisfied. In this case that substantive burden is that each of the elements of a claim of reformation must be proven by clear and convincing evidence. The judge who decides the summary judgment motion may not weigh qualitatively or quantitatively the evidence adduced on the summary judgment record. The test is not whether the judge considering summary judgment is skeptical that plaintiff will ultimately prevail.

 If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate. If a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way (i.e., that the clear and convincing standard could be met at trial), summary judgment is inappropriate. If a trial court must weigh the evidence to a greater degree than to determine that it is hopelessly inadequate ultimately to sustain the substantive burden, summary judgment is inappropriate. In fact, *Liberty Lobby* itself suggested that "trial courts should act ... with caution in granting summary judgment ... [and] the trial court may ... deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."[27]

 Finally, a point of terminology should be made. In our view, the inquiry is not whether any *reasonable* juror would find the substantive evidentiary burden satisfied. Rather, the test is whether any *rational* juror could do so. As noted, the criminal law cases employ the adjective "rational" in describing the hypothetical fact-finder.[28] Some civil cases use the term "reasonable"[29] while others use the term "rational."[30] Thus the use of "ra-

---

equivalent of a stipulation for a decision on a 'paper record.' "). That procedure may be an efficient process, but it did not happen here.

27. *Id.* at 255, 106 S.Ct. 2505 (citing *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 256–57, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948) ("We consider it the part of good judicial administration to withhold decision ... until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts.")).

28. *Supra* note 23 and accompanying text.

29. The majority opinion in *Liberty Lobby* uses the term "reasonable" most often. It, however, also uses the term "rational." *See* 477 U.S. at 254, 106 S.Ct. 2505 (asking whether "a rational finder of fact" could find the requisite element by clear and convincing evidence). In fact, Justice White, the author of the majority opinion in Liberty Lobby, wrote a dissent to another United States Supreme Court summary judgment case from that year, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986) in which he disagreed with the majority's conclusion but agreed that the appropriate inquiry was about the " 'rational trier of fact ....' " *Id.* at 587, 599, 106 S.Ct. 1348 (White, J., dissenting) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). This discrepancy led Justice Brennan in his dissent to *Liberty Lobby* to wonder whether Liberty Lobby's use of the term reasonable "is intended to be of any significance ...." 477 U.S. at 261, 106 S.Ct. 2505 (Brennan, J., dissenting).

30. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. By analogy, in the corporate law context there is a distinction that should be made when the directors' conduct is at issue. *See Paramount Communications v. QVC Network,* 637 A.2d 34, 46 (Del.Supr.1994) (holding that where the business judgment rule applies "the Court gives great deference to the substance of the directors' decision and will not invalidate the decision [or] examine its reasonableness"); *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.Supr.1971) ("A board

tional" in describing the hypothetical fact-finder would avoid any connotation that the reviewing court would be applying any qualitative judgment or objective reasonableness test in deciding when a case should go to the fact-finder. Stated differently, the judge as gate-keeper merely considers whether the finder of fact could come to a rational conclusion either way, not whether that conclusion would be objectively reasonable.

### The Clear and Convincing Evidentiary Standard

 The clear and convincing evidentiary standard is "an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt." [31] The Delaware Court on the Judiciary has described this standard as requiring "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are 'highly probable.' " [32] Authorities also say that, to meet this burden, the evidence must "produce in the mind of the fact-finder a firm belief or conviction that the allegations in question are true." [33] The Superior Court's civil jury instructions on clear and convincing evidence require the proof to be "highly probable, reasonably certain, and free from serious doubt." [34]

### Criteria for Reformation

 Courts of equity have the power to grant reformation of a contract. The Court of Chancery may use this remedy to reform a contract in order to express the "real agreement" of the parties involved. [35]

 There are two doctrines that allow reformation. The first is the doctrine of mutual mistake. In such a case, the plaintiff must show that both parties were mistaken as to a material portion of the written agreement. [36] The second is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent. [37] Regardless of which doctrine is used, the plaintiff must show by clear and

of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose."); Principles of Corporate Governance § 4.01 cmt. f (1992) (rejecting "[b]oth a 'reasonableness' test and the 'good faith alone' approach" in the context of the black letter provision adopting a "rationally believes" test in reviewing director actions under the business judgment rule); E. Norman Veasey, *An Economic Rationale for Judicial Decisionmaking in Corporate Law,* 53 Bus. Law. 681, 689 (1998) (quoting *QVC*).

**31.** *In re Tavel,* 661 A.2d 1061, 1070 n. 5 (Del.Supr.1995).

**32.** *In re Rowe,* 566 A.2d 1001, 1003 (Del.Jud. 1989) (quoting *Kaszuk v. Bakery & Confectionary Union,* 638 F.Supp. 365, 374 (N.D.Ill. 1984)); *see also* 2 John W. Strong, McCormick on Evidence § 340 (5th ed. 2001) ("It has been persuasively suggested that [the

clear and convincing standard] could be more simply and intelligibly translated to the jury if they were instructed that they must be persuaded that the truth of the contention is 'highly probable.' ").

**33.** 29 Am.Jur.2d *Evidence* § 157 (1994) (collecting cases).

**34.** Del. P.J.I. Civ. Sec. 4.3 (2000).

**35.** *Colvocoresses v. W.S. Wasserman Co.,* 28 A.2d 588, 589 (Del.Ch.1942).

**36.** *See Collins v. Burke,* 418 A.2d 999, 1002 (Del.Supr.1980) ("The Courts of this State have always insisted in reformation cases on a showing of mutual mistake or, in appropriate cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part.").

**37.** *Id.*

convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement.[38]

■ This evidence provides a comparative standard that tells the Court of Chancery "exactly what terms to insert in the contract rather than being put in the position of creating a contract for the parties." [39] This understanding need only be complete as to the issue involved. It need not constitute a complete contract in and of itself.[40] Thus, Cerberus must show that: (i) MTI thought that the merger agreement gave MTI's stockholders the proceeds of the options and warrants; (ii) either that Apollo was also similarly mistaken, or that Apollo knew of MTI's mistake and remained silent; and (iii) that MTI and Apollo had specifically agreed that the proceeds of the options and warrants would go to MTI's stockholders.

■ The Court of Chancery rightly observed that there is some ambiguity in Delaware caselaw whether a plaintiff must prove each of the elements of a mistake case by clear and convincing evidence, or only the existence of a definite prior agreement.[41] Cerberus must prove each of the required elements by clear and convincing evidence to justify reformation. Courts generally assign the clear and convincing evidentiary burden to the entire request for reformation, rather than to the specific "prior agreement" element of the mutual (or unilateral) mistake claim.[42] We know of no authority holding otherwise. Indeed, Cerberus concedes this point in its brief.

---

**38.** *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 857 (Del.Supr.1952) ("Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand.").

**39.** *Collins*, 418 A.2d at 1002.

**40.** *See* Restatement (Second) of Contracts § 155 cmt. a (1979) ("The prior agreement need not ... be complete and certain enough to be a contract."); Arthur Linton Corbin et al., Corbin on Contracts § 614 (2001) (approving of reformation either when "antecedent expressions of agreement [were] such as to constitute a valid informal contract," or when "the antecedent expressions ... [were] no more than a part of the contract that is in the preliminary process of [being made]"). *But see Home Life Ins. Co. v. McCarns*, 16 A.2d 587, 589 (Del.Ch.1940) ("[I]n order for a written instrument to be reformed in equity, it is essential that the parties thereto shall have previously reached a complete mutual understanding with respect to all of the essential terms of their bargain....").

**41.** *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, Del.Ch., C.A. No. 16425 (Mar. 13, 2001); *see*

*Collins*, 418 A.2d at 1002 (mentioning the clear and convincing evidentiary requirement in conjunction with the "second requirement" of "what actually was the prior oral agreement between parties").

**42.** *See* Restatement (Second) of Contracts § 155 cmt. c (1979) (requiring "the trier of the facts to be satisfied by 'clear and convincing evidence' before reformation is granted"); *New England Mut. Life Ins. Co. v. Lyons*, C.A. No. 11251, 1993 WL 455313 Berger, V.C. (Nov. 1, 1993) ("The party alleging mutual mistake must establish all elements of its claim by clear and convincing evidence."); *Crout v. D.E.R. Bldg. Co.*, 2001 WL 1402734, at *4, 2001 Ohio App. Lexis 5092, at *13 (2001) (noting that "the party seeking reformation must establish the existence of the mistake by clear and convincing evidence"); *Foster v. Gibbons*, 177 Or.App. 45, 33 P.3d 329, 334 (2001) ("[T]he party seeking reformation on the ground of mutual mistake must prove, by clear and convincing evidence, the existence of an antecedent agreement to which the contract can be reformed, a mutual mistake, and that the party seeking reformation was not guilty of gross negligence."); Corbin, *supra* note 40 ("Reformation will not be decreed unless the facts required for such a decree are proved convincingly and to the entire satisfaction of the court.").

### Reformation of the Merger Agreement of MTI and Apollo

■ This Court reviews de novo the granting of a summary judgment by the Court of Chancery.[43] Accordingly, we apply to the facts of this case the appropriate summary judgment review standard, together with the law on contract reformation.

■ First, we turn to the element of the prior agreement. Cilurzo told Harris in writing that having the proceeds from the options and warrants go to MTI's stockholders was a condition to further negotiations, and Harris responded in his handwritten note on that writing: "This looks fine." Absent any evidence that this term was eliminated in the negotiation process (and there is none on this record), it is certainly a permissible inference that the parties had a prior agreement relative to the proceeds from the options and warrants.

Given the purpose of the clear and convincing evidentiary requirement that tends to uphold a contract as the parties' written expression of their intent,[44] documentary evidence of a prior agreement is particularly persuasive in overcoming that burden. Thus, Cerberus has offered more than a mere scintilla of evidence on this element. A rational trier of fact could have, after considering all the evidence adduced at trial, "an abiding conviction that the truth of [the] factual contentions are 'highly probable' "[45] and that this was the "real agreement" of the parties.

Moreover, Apollo's evidence is not persuasive in contradicting this evidence so as to make this an appropriate case for summary judgment by ruling out the possibility that clear and convincing evidence would develop at trial. Apollo points out that Joyce Johnson–Miller, Cerberus' representative for the negotiations, agreed that "there's no binding agreement on the parties until the negotiations are done and everybody signs." The fact of an agreement and its legal significance are two separate matters.[46]

It is also true that Harris testified that the merger agreement reflected his eventual "understanding of the warrant and options proceeds," but Harris did not deny his agreement to Apollo's initial conditions for negotiations. Edwards, one of MTI's lawyers, testified that he was not aware of any agreement regarding the proceeds from the options and warrants other than that contained in the merger agreement. Given that such an admission would be tantamount to an admission of negligence, however, the trier of fact should consider Edwards' credibility.

Moreover, Cilurzo's testimony that he gave Edwards and Davis a copy of the points set out in the November 26 letter and told them to incorporate that into the merger agreement contradicts Edwards' testimony. Thus, a rational trier of fact,

**43.** *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1276 (Del.Supr.1994).

**44.** *See* Restatement (Second) of Contracts § 155 cmt. c (1979) ("Care is all the more necessary when the asserted mistake relates to a writing, because the law of contracts, as is indicated by the parol evidence rule and the Statute of Frauds, attaches great weight to the written expression of an agreement.").

**45.** *In re Rowe*, 566 A.2d 1001, 1003 (Del.Jud. 1989) (quoting *Kaszuk v. Bakery & Confection-ary Union*, 638 F.Supp. 365, 374 (N.D.Ill. 1984)).

**46.** *See* Corbin, *supra* note 40 (opining that reformation is available even in cases in which the parties "say that they are not to be bound by contract until execution of a written instrument" because the written contract's terms "are found in their antecedent ... expressions").

after a trial with live witnesses whose credibility can be tested, could find that it was highly probable that MTI and Apollo had a specific prior agreement that MTI's stockholders would receive the proceeds from the options and warrants.

■ Cerberus must show that MTI mistakenly believed that the merger agreement gave the proceeds from the options and warrants to its stockholders. Apollo concedes that at least part of the Consent Solicitation statement reflects such a mistake. Cilurzo's notes from a conference call with Pike and Davis regarding the consent solicitation also indicate such a mistaken belief. Given the complexity of the provisions that defined the merger price, it is not difficult to believe that lay persons, even ones as sophisticated as those on MTI's side of the negotiations, failed to understand all the provisions. Indeed, Pike described his discomfort with the pricing provisions in general, and that Davis had reassured him concerning them.

Furthermore, if MTI understood that its stockholders were to get $6 million less from the merger than MTI previously expected, it seems odd that there is not, on this record, some discussion of that issue during the merger negotiations. In our view, a rational trier of fact would have expected to see some evidence that this point had been negotiated away, given Harris' original written agreement that "This looks fine." There was none.

Apollo points out that Davis and Edwards testified that there was no mistake. A rational fact-finder, again, could discount the credibility of these statements as self-serving, given the evidence to the contrary. Cilurzo's notes from a conference call at which Edwards was a party, as well as Cilurzo's testimony that Davis reacted to Apollo's post-merger position on the matter with shock and anger, contradicts Davis' testimony. Moreover, both Edwards and Davis very specifically testified that no one from MTI told them of such a belief *after* the first draft of the merger agreement. A rational fact-finder could infer from this testimony that they were indeed told of this belief *before* the first draft, and that MTI thought this point to be so basic it need not be brought up again.

Apollo also refers to the admissions of Pike and Johnson–Miller that they never saw a specific provision in the merger agreement that gave the proceeds from the options and warrants to MTI's stockholders. Any mistake claim by definition involves a party who has not read, or thought about, the provisions in a contract carefully enough.[47] Moreover, at least Pike's testimony indicates that, while he was uncomfortable with the merger agreement's language, he became reassured by Davis' explanation of it.

Finally, Apollo's citation of *Cantor Fitzgerald, L.P. v. Cantor*[48] is unpersuasive. In that case, the defendants asked the Court of Chancery to reform a contract to

---

**47.** *See* Restatement (Second) of Contracts § 155 cmt. a (1979) ("Reformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing...."). Some jurisdictions do say that a degree of fault greater than negligence bars reformation. *See id.* § 157 (barring reformation if the fault "amounts to a failure to act in good faith and in accordance with reasonable standards of

fair dealing"); *Foster,* 33 P.3d at 331 (forbidding reformation based on plaintiff's "gross negligence"). This Court has never adopted such a rule. This case takes no position on whether, under certain circumstances, a party's misconduct could bar a reformation claim.

**48.** 2000 Del. Ch. Lexis 43 (Del. Ch.).

give them the right to compete with the plaintiff.[49] The defendants, however, admitted to having *no* understanding whether the contract did, or did not, give them this right to compete.[50] In requesting reformation, the plaintiff must show that he or she was mistaken and had "a belief that is not in accord with the facts."[51] The plaintiff that has *no* belief is not *mistaken.* Here, by contrast, those on the side of MTI did indeed testify that they understood that the merger agreement gave the proceeds from the options and warrants to MTI's stockholders, although that belief turned out to be a mistaken one. Thus, a rational trier of fact could also find it highly probable that MTI did believe that the merger agreement gave its stockholders the proceeds from the options and warrants as previously agreed, a belief that turned out to be mistaken.

Finally, Cerberus must show either that Apollo shared MTI's mistaken belief or that Apollo knew of MTI's mistake and remained silent. There was substantial evidence tending to show either conclusion. First, some evidence tended to show that Apollo shared MTI's mistaken belief, at least until the time the transaction closed. Several written documents, at various times throughout the merger negotiations, indicate that Apollo planned to pay $65 million for the merger. This figure is consistent with Cerberus' claim.

On the other hand, the fact that Apollo notified MTI of its intention to pay less than MTI expected so soon after the transaction closed implies that Apollo was not mistaken about the effect of the merger agreement. If so, a rational fact-finder could question that Apollo did not know that MTI expected $6 million more than Apollo in a transaction worth only $60 million. This may be especially difficult for a rational fact-finder to believe, given the emphasis MTI placed on the matter at the outset of merger negotiations. If indeed Apollo was not mistaken, a finder of fact could rationally conclude that Apollo knowingly remained silent about the mistake, hoping to profit from it. That is the kind of conduct the unilateral mistake doctrine was designed to remedy.[52] Based on the summary judgment record before this Court, a rational trier of fact could find by clear and convincing evidence that Apollo shared MTI's mistaken belief, or that Apollo did not share MTI's mistaken belief but knew of it and remained silent.

### Conclusion

The Court of Chancery correctly articulated the standard governing a motion for summary judgment, but it incorrectly applied that standard to the facts of this case. We find on this record that a rational trier of fact could find by clear and convincing evidence either a mutual mistake of fact or a unilateral mistake and

---

49. *Id.* at *16–17.

50. *Id.* at *19 ("Defendants repeatedly stated that they did *not* have an understanding of the terms of the Agreements when they were drafted."). One of the plaintiffs, Iris Cantor, testified that after a meeting with her lawyer she came away with an understanding that the contract would give her a " 'free, independent, strong company,' " but admitted that nothing was said about the right to compete. *Id.* at *21–23.

51. Restatement (Second) of Contracts § 151 (1979). The Restatement, however, does specify that "[t]he belief need not be an articulated one, and a party may have a belief as to a fact when he merely makes an assumption with respect to it, without being aware of alternatives." *Id.* cmt. a.

52. *See Collins v. Burke,* 418 A.2d 999, 1002 (Del.Supr.1980) (allowing reformation "in appropriate cases" for "unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part").

knowing silence. Accordingly, we reverse the judgment of the Court of Chancery and remand for further proceedings consistent with this Opinion.

STEELE, Justice, concurring in part, dissenting in part.

I agree with and, therefore, concur in, the majority's articulation of the three elements that a party must prove to reform a written agreement and that clear and convincing evidence of each of those elements must be proved at trial in order to reform an unambiguously worded written agreement.

I further agree with the majority's conclusion that the Vice Chancellor correctly considered the Appellee's motion for summary judgment in light of the Appellants' burden of establishing its case by clear and convincing evidence at trial.

To the extent the majority's holding encompasses the latter two issues, I concur.

The majority opinion ultimately holds, however, that "the trial court erred in granting summary judgment."[53] I cannot agree that the record reveals a triable issue of material fact in regard to the elements necessary to establish mutual mistake, as urged by the Appellants, or "unilateral mistake coupled with knowing silence"[54] as analyzed by the majority. Therefore, I must respectfully dissent.

In my view, the Vice Chancellor correctly concluded that the evidence ultimately fails to establish either Apollo's complicity in an earlier agreement that is inconsistent with the written contract Cerberus seeks to reform or that Apollo either was a party to a mutual mistake or remained silent with knowledge of MTI's unilateral mistake.

The clear and convincing standard for reformation is a product of the necessary assumption that an unambiguous written agreement is valid on its face and accurately reflects the intentions of the parties. To this end, an agreement will only be set aside when there is no serious doubt that one party has unfairly procured its execution or that the parties informally made a specific agreement and that the process of finalizing the formal terms failed to conform them to those of the original agreement.[55] The record supporting the Vice Chancellor's ruling granting the summary judgment motion from which Cerberus appeals cannot, in my view, be interpreted to raise any genuine issue of material fact in dispute that, if proved, would raise any serious doubt that the contract adequately reflected the agreed upon terms.

I am unable to agree that a rational factfinder could conclude that the evidence both clearly and convincingly demonstrates that Apollo and MTI reached a final agreement allowing MTI's shareholders to retain the options and warrants proceeds before the parties signed the integrated merger agreement which provided that MTI would retain those proceeds. The majority's opinion, as I read it, rests on the theory that Harris' handwritten reply to a list of conditions MTI considered important to the furtherance of merger negotiations created an inference that Apollo believed the final agreement would include a $65 million payment for MTI with MTI's shareholder's retaining the existing warrant and option proceeds. In *Hob Tea Room, Inc. v. Miller*, we held that reformation is improper unless there

---

**53.** *Supra* p. 1143.

**54.** *Id.*

**55.** *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 856–57 (Del.Supr.1952); *see also Colvocoresses v. W.S. Wasserman Co.*, 28 A.2d 588, 591 (Del.Ch.1942).

was a *clear understanding* between the parties with which the formal contract conflicts.[56] At best, Harris' hastily written reply can be considered ambiguous. The majority suggests that the Vice Chancellor could have rationally concluded that clear and convincing evidence of a earlier agreement existed by noting the absence of any evidence that this "term" was eliminated in the negotiation process. However, I cannot follow this reasoning. The absence of negotiations eliminating the "term" can only be relevant if one assumes that Harris' three-word reply amounted to a final agreement on the disposition of the options and warrants proceeds. The lack of negotiation on this discrete point may serve to bolster MTI's contention that *it* subjectively believed that such an agreement existed and that the negotiated terms of the merger were contrary to those ultimately included in the written merger agreement. However, that circumstance cannot meet the threshold of clear and convincing evidence that the parties preliminarily reached an actual, mutual meeting of the minds on this issue before their sophisticated representatives and experienced counsel reduced the complete understanding of the parties to writing.

The remainder of the majority's reasoning in support of the existence of an agreement is not based upon any affirmative evidence, but on the failure of Apollo to present persuasive evidence to the contrary. In *Burkhart v. Davies*,[57] we adopted the general standard set out by the United States Supreme Court in *Celotex Corp. v. Catrett*[58] that places the burden squarely on the shoulders of the plaintiff to establish, at the summary judgment stage, the existence of sufficient evidence to create a genuine issue of material fact in dispute concerning those elements essential to that party's case. To this end, the moving party does not have the burden of producing evidence to show the absence of a material fact in dispute.[59] The majority's assertion that Apollo bears a responsibility to rebut affirmatively Cerberus' allegation that a possibility exists that clear and convincing evidence *might be developed at trial* stands in stark contrast to the *Celotex* standard this court has adopted.[60] A proper application of this standard leads to the conclusion that Cerberus can only support its contention that an initial mutual meeting of the minds existed by referencing Harris' three-word reply to MTI's November 26, 1997 memorandum. I find it difficult to accept the majority's holding that the Vice Chancellor could infer from this solitary notation that the record contained clear and convincing evidence that would instill "an abiding conviction that the truth of the factual contentions are highly probable"[61] that an initial agreement had been reached on the allocation of the options and warrants contrary

**56.** 89 A.2d at 857.

**57.** 602 A.2d 56 (Del.Supr.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

**58.** 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**59.** *Id.* at 325, 106 S.Ct. 2548.

**60.** In fact, Appellants' counsel made it clear at oral argument that the full record that could be produced had been for summary judgment. Hence, the majority's reliance on the need to assess the "credibility" of the witnesses at trial. I have serious doubt that the resolution of any issue about what these sophisticated parties knew or did not know about the other's position before entering into a formal written agreement could be resolved by an assessment of their representatives' physical appearance as they testified live to the evidence recited in their affidavits.

**61.** *In re Rowe*, 566 A.2d 1001, 1006 (Del.Jud. 1989) (citations omitted).

to the terms of the written merger agreement.

Moreover, I find no evidence in the record that supports the majority's position that a fact-finder could rationally conclude that it was highly likely that Apollo either shared MTI's mistake concerning the warrants and options provision, or that it knew of MTI's misinterpretation of the agreement and knowingly remained silent. The majority tacitly admits that the swift notice Apollo provided MTI that it intended to pay the shareholders only the $58 million reflected in the merger agreement precludes a finding of a mutual mistake. Therefore, the majority conclusion necessarily hinges on record evidence that Apollo had both knowledge of MTI's misunderstanding of the agreement and that it chose to remain silent in order to reap the resulting advantage. The only record evidence to support this claim, relied upon by the majority in its decision, is limited to the existence of certain of Apollo's internal documents that indicate a potential purchase price of $65 million. Citing these, the majority found that "a rational fact-finder could question that Apollo did not know that MTI expected $6 million more than Apollo in a transaction worth only $60 million." [62] However, the record evidence before the Vice Chancellor is entirely consistent with the buyer paying an amount based on the option/warrant proceeds going to MTI, exactly as the merger agreement recites. Indeed, the issue is not the purchase price, but the disposition of certain of the purchased assets, namely the options and warrants proceeds, following the conclusion of the agreement. Cerberus also fails to point to any evidence tying the presence of this figure in Apollo's internal notations to Apollo's knowledge of MTI's subjective belief or to the existence of the alleged previous agreement, despite the fact that, as noted *supra,* Cerberus bears the burden of placing sufficient evidence in the record to create a genuine issue of material fact in dispute in order to overcome a motion for summary judgment. Given the dearth of evidence imputing actual knowledge to Apollo, the inference that the majority suggests a rational fact-finder could make from these documents amounts to little more than sheer speculation, much less the requisite clear and convincing evidence. Indeed, the majority surprisingly concludes that the fact-finder "could question" Apollo's knowledge, not that a fact-finder could find it highly likely that Apollo knew of MTI's expectations or belief in a contrary agreement, which is the substantive standard required.

Furthermore, I frankly do not follow the issue of credibility raised by the majority. Much of the majority's argument rests on the notion that summary judgment was inappropriate in this instance because issues of credibility remained to be resolved. I agree that when credibility is at issue it is a matter best resolved at trial, but that point is not relevant here. I must respectfully disagree with the majority's assertion that the Vice Chancellor was forced to evaluate the credibility of the witnesses in this case to render his decision. Rather, I interpret his ruling to be one in which, after properly accepting the veracity of those statements supportive of MTI's position and giving Cerberus the benefit of all reasonable inferences, the Vice Chancellor still found the evidence supporting the elements for reformation to be unclear and unconvincing.

In my view, the majority opinion fails to give adequate consideration to the fundamental fact that the merger agreement had been negotiated by two highly sophisticated parties and their equally sophisti-

---

62. *Supra* p. 1155.

cated attorney representatives. Indeed, the very purpose of the enhanced burden that accompanies a reformation claim is to bolster the presumption that the best evidence of the intent of the parties is not extrinsic, but is the written instrument itself. I agree with the application of the *Liberty Lobby* rule requiring a party to meet this heightened standard at the summary judgment stage because it serves to protect both the integrity of the agreement and its swift implementation from those seeking to recoup in the courts that which they could not achieve in negotiation. The Vice Chancellor rightly recognized that the scant evidence of either a mutual meeting of the minds or an unilateral mistake by MTI compounded by Apollo's silence was insufficiently compelling in the face of the integrated document to support reformation, even when he gave the evidence in favor of the non-moving party, Cerberus, both the presumption of credibility and the benefit of all reasonable inferences.

The principal purpose of our summary judgment rule is to "isolate and dispose of" factually unsupported claims and defenses.[63] Although the majority's citation to *Liberty Lobby* pays lip-service to the importance of the rule, a willingness to allow claims grounded in little more than pure speculation to proceed to trial tends to marginalize summary judgment's usefulness. As the United States Supreme Court has properly noted, summary judgment should not be regarded as a disfavored procedural shortcut. Instead, it is an integral part of the rules of civil procedure that is designed "to secure the just, speedy, and inexpensive determination of every action."[64] It is not only appropriate

under the rule, but good public policy to give the Court of Chancery the flexibility to prevent factually insufficient claims from going to trial and unnecessarily consuming our scarce public resources.[65]

Although I appreciate and respect the desire of the majority to ensure that our courts give due regard to the rights and claims of those seeking redress in the judicial system, their good intentions are misplaced in this instance. One of the fundamental purposes of our Court of Chancery is to either craft or deny equitable relief based on the substance of the cases before it. The summary judgment rule aids in this purpose by allowing a trial court to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial."[66] The majority's suggestion that the Vice Chancellor should have regarded such highly speculative evidence to be sufficient to allow Cerberus to defeat Apollo's motion for summary judgment undermines the very purpose of the *Liberty Lobby* rule, which is to secure a just result while precluding the expensive prosecution of claims that are based on facts clearly inadequate to meet the substantive burden of proof. By so doing, the ability of the Court of Chancery to employ the broad scope of summary judgment in an effort to promote the important interest the courts, the public, and the parties maintain in the efficient administration of justice may be regrettably called into question. Accordingly, I must dissent from the majority's holding in this case.

---

63. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

64. *Id.* at 327, 106 S.Ct. 2548 (citations omitted).

65. *Id.*

66. Fed R. Civ. P. 56(e), advisory committee's note (1963).