# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE 11 WEST PARTNERS, LLC | ) Consolidated |
| | ) C.A. No. 2017-0568-SG |

## MEMORANDUM OPINION

Date Submitted: December 11, 2018
Date Decided: March 20, 2019

C. Barr Flinn, Emily V. Burton, and Daniel Kirshenbaum, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael J. Bowe, Alexander B. Simkin, and John A. Dunn, of KASOWITZ BENSON TORRES LLP, New York, New York, *Attorneys for Erwin Gonzalez.*

Ryan P. Newell, Kyle Evans Gay, and Shaun Michael Kelly, of CONNOLLY GALLAGHER LLP, Wilmington, Delaware; OF COUNSEL: Stan Chelney and Philipp Smaylovsky, of CHELNEY LAW GROUP PLLC, New York, New York, *Attorneys for Adam Goldenberg and Abraham Eisenstat.*

GLASSCOCK, Vice Chancellor

This matter is the result of an unfortunate rupture in the business relationship of three former friends, Messrs. Gonzales, Eisenstat, and Goldenberg. Starting in 2015, the three began investing in real estate in Oakland, California. Goldenberg, who had recently moved to California, was the "genius" who located investment opportunities and, once acquired, made them valuable; Eisenstat found the investors, most of whom were recruited from a group of acquaintances who valued his integrity and business acumen; and Gonzales, detail-oriented and meticulous, handled the business operations. Gonzales and Eisenstat lived in New York.

With respect to each real property investment, the parties created similar structures. Omitting pass-through entities, each property was owned by a distinct partnership of investor-limited partners, controlled by a general partner. That general partner was a specific Delaware LLC for each property, each with Gonzales, Eisenstat, and Goldenberg as its sole members, where each member held a one-third interest. The LLCs at issue here control three properties in Oakland, the "Old Oakland," the "West Grand," and the "American Steel" properties.

The relationship between Gonzales and Goldenberg began to deteriorate in 2016; the parties dispute the cause, but the situation was exacerbated by the two men's opposing political inclinations with respect to the presidential election that year. In any event, purportedly pursuant to the LLC Joint Venture Agreements (the "JVAs"), Goldenberg attempted to remove Gonzales from any authority with

respect to the three ventures.  Gonzales brought this action, pointing to the JVAs in the three projects, which provided that major decisions—like ousting a member—require unanimous agreement of the members.  Goldenberg and Eisenstat (the "Majority Members") brought a separate action, in which they sought reformation of the JVAs.

Currently before me is the Majority Members' request to reform the JVAs to conform to what they allege was the parties' intent: that Goldenberg had the power to make major decisions unilaterally.  They point to language providing such in an earlier JVA, pertaining to the LLC that controlled the "Peralta" property, and argue that the failure to include similar language in the later JVAs was a scrivener's error. I agreed to try this potentially-dispositive issue first, and a one-day trial on reformation was held on August 9, 2018.  Briefing and further evidentiary submissions followed.

This Memorandum Opinion addresses only the issue of reformation.

The bulk of the testimony was given by the three principals.  The stories of Gonzalez, Goldenberg, and Eisenstat, with respect to the parties' intent regarding each General Partner's control over major decisions, are divergent.  This Court has previously noted the conclusions of social scientists and psychologists that witnesses may come to believe in factual scenarios beneficial to them, even though

the true facts are otherwise.[1] It does not require a social scientist to note, however, that individuals may come to consider ambiguous circumstances as concrete, where doing so aligns with their own perception of justice. Nor does it require a psychologist to note that perceptions of justice may be colored by self-interest.

Such considerations, I believe, led to discrepancies in the testimony here. I believe all three men are honorable, and are testifying to the truth as they recall it. My takeaway from the testimony is this: The control issue was debated closely by the parties as they crafted the Peralta JVA. As time to close on that property grew short with the issue unresolved, the parties agreed to defer control for that project to Goldenberg. The parties anticipated future projects, but there was no meeting of the minds as to control for such projects.

With respect to those future projects, the parties hired new counsel to draft the subsequent JVAs. The parties gave new counsel the Peralta documents, including the JVA, as a guide. Counsel expressed to the parties that the Peralta JVA was deficient, and would need to be amended. In their single face-to-face meeting with counsel, the parties briefly discussed control and the need to protect Eisenstat's investors in that regard. Goldenberg and Eisenstat had the impression, nonetheless, that counsel would not fundamentally amend the JVAs going forward without

---

[1] *See Fox v. CDX Holds., Inc.*, 2015 WL 4571398, at *3 (Del. Ch. July 28, 2015), *aff'd*, *CDX Holds., Inc. v. Fox*, 141 A.3d 1037 (Del. 2016).

specifically notifying the partners. Although the parties received the second JVA, which governed the Old Oakland property, with a cover letter advising them to read it and communicate any concerns, Goldenberg and Eisenstat executed the JVA, and the subsequent two JVAs, without reading them. Goldenberg and Eisenstat were unaware, therefore, that the three JVAs require that major decisions be unanimous. Gonzales, on the other hand, did read the JVAs, saw that what he considered to have been the open control question had been settled, in a manner more favorable to him (and to Eisenstat) than was the case with the Peralta JVA, and signed the document. Subsequent JVAs tracked the Old Oakland JVA; the Managing Members executed those sans review, as well.

In order to reform the JVAs to make them consistent with the Peralta JVA, as the Defendants request, I would have to find, by clear and convincing evidence, that all three partners intended that Goldenberg have unilateral control, and mistakenly thought that the JVAs so provided, or that only Gonzales knew that the JVAs did not comport with the parties' true agreement but nonetheless executed the JVAs and failed to inform the others of the error. This, based on the record, I cannot do. More likely, in my view, is the scenario laid out above. Because I cannot find the elements for reformation by clear and convincing evidence, the request to reform the JVAs is denied, and the clear language of the JVAs as to control shall apply to the issues remaining.

My reasoning follows.

## I. BACKGROUND

A.    *The Parties*

Erwin Gonzalez, Adam Goldenberg, and Abraham Eisenstat (collectively, "the parties") are the only members of 11 West Partners, LLC ("11 West").[2] They formed 11 West in 2015, to centralize operations of their business ventures, which involved real estate investment in Oakland, California.[3]

B.    *Factual Background*

1. Formation of 11 West and the Joint Ventures

11 West was incorporated in early 2015, when its three members convened to invest in a property in Oakland, California, the Peralta Joint Venture.[4] Goldenberg identified the property, then enlisted Gonzalez to provide administrative support and Eisenstat to help raise capital.[5] Each member brought a different skill set to the LLC: Gonzalez ran the business, Goldenberg was the point-person at the properties in Oakland, and Eisenstat provided access to capital.[6] Goldenberg and Gonzalez were paid an annual salary of $300,000 as employees of 11 West.[7] Eisenstat did not receive a salary because he was not involved in the LLC's day-to-day operation.[8]

Ultimately, the parties pursued four real estate projects in Oakland that are relevant here: (1) 11 West 2431 Manager, LLC (the "Peralta Joint Venture"), which

---

[2] *See* JX 73.

6

closed in April 2015; (2) 11 West Ninth Street Joint Venture, LLC (the "Old Oakland Joint Venture"), which closed in September 2015; (3) 1699 West Grand Joint Venture, LLC (the "West Grand Joint Venture"), which closed in October 2015; and (4) 11 WGM Joint Venture, LLC (the "American Steel Joint Venture"), which closed in November 2016.[9] For each of these four projects, 11 West is the General Partner for a Limited Partnership; it owns 0.5% of each Limited Partnership and earns an asset management fee of 2% of the Limited Partnership's assets.[10] Third-party investors serve as Limited Partners, providing the capital for the projects.[11] Each project has a JVA and a subscription agreement, which together detail the parties' and the investors' rights and obligations.

The Peralta Joint Venture was 11 West's first investment; accordingly, that project's JVA was the first in which the parties memorialized their roles and obligations.[12] There was much back-and-forth between the parties and 11 West's counsel on how to allocate control, and specifically how much input should be

---

[3] JX 27; JX 28; JX 546.
[4] JX 27; JX 28.
[5] Gonzalez Dep. 191:10–19; Eisenstat Dep. 167:25–168:6.
[6] JX 472 ¶ 22.
[7] *Id.* ¶ 23.
[8] *Id.*
[9] Gonzalez Dep. 10:5–15; 44:19–22; 74:8–15; 221:2–17.
[10] JX 472, at Subexs. B, D, F.
[11] Trial Tr. 12:3–13:1 (Aranoff); Gonzalez Dep. 192:22–193:6.
[12] *See* Trial Tr. 45:4–5 (Eisenstat) ("It was clearly the first of what would be many purchases.").

delegated to Eisenstat.[13] Meanwhile, time was of the essence, and delay would jeopardize the Peralta project's success.[14] Ultimately, the parties decided to include Eisenstat in decisions (along with Gonzalez and Goldenberg), but to give Goldenberg ultimate decision-making authority for the Peralta Joint Venture in situations where the parties were unable to agree.[15] The Peralta JVA was created by counsel, Michael Marx.[16]

When the parties pursued their second joint venture, the Old Oakland Joint Venture, they retained new counsel, Schulte Roth & Zabel LLP ("Schulte").[17] This was for primarily two reasons: first, because Goldenberg preferred to work with Schulte, and second, because of the Old Oakland Joint Venture's increased size and complexity as compared to the Peralta Joint Venture.[18] Additionally, the parties had been unsatisfied with Marx's work on the Peralta JVA.[19]

On July 1, 2015, the parties met with Julian Wise, a partner at Schulte. At that time, Wise explained that he represented the partnership, not its individual members.[20] The parties disagree on the decision they made at that time as to the Old

---

[13] JX 30; JX 31; JX 32; JX 33; JX 34; JX 35; JX 38; JX 39; JX 40; JX 42; JX 44.
[14] Trial Tr. 376:15–24 (Gonzalez).
[15] JX 92 at SRZ0007198–SRZ0007209; JX 475 at Ex. A § 4(a).
[16] JX 35; JX 60.
[17] JX 60.
[18] JX 77. The parties had originally intended to use Schulte for the Peralta Joint Venture, but Schulte declined because the transaction was too small. JX 1; JX 2; Trial Tr. 56:2–4 (Eisenstat).
[19] *See* JX 50; Gonzalez Dep. 83:24–84:4.
[20] Goldenberg Dep. 348:4–18; Eisenstat Dep. 45:22–46:3; Wise Dep. 82:16–23; *see also* Gonzalez Dep. 84:10–16 (in a slight variation from the others' depositions, Gonzalez recalled that Wise told

Oakland JVA; the Majority Members contend that the parties instructed Wise to model the Old Oakland JVA off the Peralta JVA, whereas Gonzalez submits that he left the meeting with the impression that Wise thought the Peralta JVA was "a piece of trash" and planned to "junk it."[21]  Nearly one month later, on July 31, 2015, Gonzalez sent the Peralta JVA to Schulte, along with an email that said, "please let us know what should be our next step."[22]  On August 11, 2015, in an e-mail chain with the subject line "Investor docs," Goldenberg instructed Schulte to keep the Old Oakland documents as similar to the Peralta documents as possible.[23]  Gonzalez added, "[p]lease let us know if you need anything from us to move this along."[24]  In an August 14 email within the same chain, Goldenberg asked Schulte, "Any sense of timing? Do we know if we have to start over, or if there's anything salvageable from our first deal?"[25]

On September 11, 2015, a Schulte associate emailed a draft of the Old Oakland JVA to the parties.[26]  This draft was not based on the Peralta JVA, as the associate was apparently unaware of the Peralta JVA's existence, and was instead

the partners that Schulte represented all three of them and that this arrangement was not fair to any of the three).

[21] Gonzalez Dep. 84:7–9; *see also* Eisenstat Dep. 44:25–45:2.
[22] JX 506, Subex. 6.
[23] JX 93.
[24] JX 506, Subex. 6.
[25] JX 506, Subex. 7.
[26] JX 506, Subex. 1 ¶ 48; JX 158.

based on a template Schulte had used previously in an unrelated transaction.[27] Unlike the Peralta JVA, the Old Oakland JVA required unanimity on major decisions.[28] It also contained an entire agreement clause.[29] Despite the fact that, per the Managing Members, the parties thought that the new JVA would mirror the Peralta JVA—which it manifestly did not—the parties signed this agreement (that is, the Old Oakland JVA) on September 29.[30] They also executed subscription agreements, which, in a section titled "Investment Risks," stated that "in the event of a disagreement or deadlock between the members the approval or disapproval of Adam Goldenberg (in his sole discretion) is final and binding."[31]

Thereafter, the parties pursued two more deals, the West Grand Joint Venture and the American Steel Joint Venture. For each of those ventures, 11 West used Schulte as its counsel. The parties signed and executed JVAs that included the same unanimity requirement as the Old Oakland JVA, as well as substantively identical subscription agreements.[32]

---

[27] JX 144, at SRZ0109429.
[28] *See* JX 472, Subex. A.
[29] *Id.* § 10.7. This clause read: "This Agreement contains the entire understanding between the parties and supersedes any prior understanding and oral agreements between them respecting the subject matter of this Agreement. There are no representations, agreements, arrangements or understandings, oral or written, between and among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein." *Id.*
[30] JX 472, Subex. A; Trial Tr. 56:2–4 (Eisenstat).
[31] JX 91 at MAJ039916. The provision continues, "There can be no assurance, however, all third parties . . . or the Managing Member will accept such determination by Mr. Goldenberg if the members do not universally agreed [sic] (and may instead require unanimous approval from all of the three members), which could result in a deadlock situation . . . ." *Id.*
[32] JX 183 §§ 6.2, 10.7; *see also* JX 59, Subex. D.

## 2. The Relationship Deteriorates

In June 2016, Goldenberg took a two-week vacation with his family, while Gonzalez moved his family to San Francisco for the summer to be the point-person in the American Steel Joint Venture.[33] While Goldenberg was away, Eisenstat and Gonzalez met to discuss a construction project.[34] Gonzalez suggests that this conversation, in Goldenberg's absence, concerned and irritated Goldenberg.[35] In any event, upon his return, Goldenberg and Gonzalez had a terse discussion regarding management of the business.[36]

On November 9, 2016, the day after the presidential election, Goldenberg confronted Gonzalez at the Old Oakland site and asked if he had voted for Donald Trump.[37] When Gonzalez told Goldenberg that he had, in fact, voted for Donald Trump, Goldenberg was angry.[38] A verbal altercation ensued, with Goldenberg becoming upset with Gonzalez's presidential vote and in which state Gonzalez had voted.[39] Goldenberg said that he could no longer trust Gonzalez, a statement he maintained even after the two parted ways and had time to cool off.[40]

---

[33] Eisenstat Dep. 328:10–14; *see also* Gonzalez Dep. 244:11–17.
[34] Gonzalez Dep. 253:5–254:16.
[35] Erwin Gonzalez's Amended Pre-Trial Br., at 31.
[36] Gonzalez Dep. 257:5–18; Eisenstat Dep. 317:10–325:19.
[37] Eisenstat Dep. 341:24–346:19.
[38] *Id.*
[39] *Id.* The record indicates that Goldenberg was upset because Gonzalez voted in Florida, where he owns a home, even though he purportedly spent most of his time in New York, where his children attend school. *Id.*
[40] *Id.*

After the November 9 falling out, Goldenberg told Eisenstat that he would no longer work with Gonzalez and that he planned to liquidate the partnership's assets unless Gonzalez agreed to exit 11 West.[41]  In early 2017, Eisenstat and Goldenberg realized that under the Old Oakland JVA, the Grand West JVA, and the American Steel JVA, Gonzalez had a consent right on major decisions relating to those projects.[42]  Eisenstat and Goldenberg discussed this contractual language with Schulte, whose attorneys replied that upon review, they determined that they had never been instructed to use the Peralta JVA as a model, and that some of them had never seen it.[43]

In summer 2017, Eisenstat and Gonzalez discussed Gonzalez's involvement in the partnership.  Eisenstat requested that Gonzalez sign an amendment to the JVAs that would reduce Gonzalez's authority within 11 West; Gonzalez declined.[44]

C.    *This Litigation*

Gonzalez brought suit against Eisenstat and Goldenberg (collectively, the "Majority Members") on August 8, 2017, and filed an Amended Complaint on December 1, 2017.  The amended complaint asserted seven causes of action, including actual and anticipatory breach of the JVAs, breach of fiduciary duty, and

---

[41] Eisenstat Dep. 365:7–16, 371:24–376:4.  Eisenstat maintained that Goldenberg and Gonzalez's falling out was an impetus for this decision, but that concerns regarding Gonzalez's management style were the underlying reason. *Id.*
[42] Trial Tr. 104:13–24 (Eisenstat).
[43] JX 368; JX 411; Wise Dep. 271:24–273:11.
[44] Eisenstat Dep. 404:12–405:15; *see also* JX 462; JX 441.

usurpation of corporate opportunities by the Majority Members.[45] It also sought an accounting and injunctive and declarative relief.[46] On December 6, 2017, the Majority Members filed suit against Gonzalez, seeking to dissolve 11 West and seeking reformation of the JVAs. I consolidated the two cases on December 18, 2017.

On December 8, 2017, I denied Gonzalez's Motion for a Temporary Restraining Order; I denied Gonzalez's second Motion for a Temporary Restraining Order on January 8, 2018. On March 27, 2018, the Majority Members moved to expedite their claim for reformation and petition for dissolution. I held trial on the reformation claim on August 9, 2018. Post-trial oral argument was held on November 27, 2018. On December 11, 2018, the Majority Members filed a video recording of deposition testimony; at that point, the issue of reformation was submitted for decision.

## II. ANALYSIS

The Court of Chancery has the power "to reform a contract in order to express the 'real agreement' of the parties involved."[47] A party seeking reformation must prove three elements by clear and convincing evidence: (1) that the party was

---

[45] JX 453.

[46] *Id.*

[47] *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member*, 2012 WL 1869416, at *12 (Del. Ch. May 16, 2012) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt, L.P.*, 794 A.2d 1141, 1151 (Del. 2002)); *see also Miller v. National Land Partners, LLC*, 2014 WL 2601378, at *14 (Del. Ch. Mar. 19, 2014).

mistaken about the contents of the final, written agreement; (2) that either its counterparty was similarly mistaken or that the counterparty knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement.[48]

## A.    There Was No Mutual Mistake or Advantage-Taking

I start with the second prong of the reformation analysis, which requires me to analyze whether there was mutual mistake between the parties, or whether Gonzalez knew that the Majority Members were mistaken, but remained silent so as to take advantage of their mistake. The evidence at trial shows that the Majority Members did not read the Old Oakland JVA or either of the two subsequent JVAs that gave the parties equal decision-making authority. Nevertheless, failure to read does not *per se* indicate that there was no mistake, or that reformation is unavailable.[49] For purposes of this analysis, I assume that the Majority Members were mistaken.

Based on the evidence at trial, I find that although the Majority Members did not read the JVAs, Gonzalez did. When he signed the JVAs, he certified that he had

---

[48] *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at *10 (Del. Ch. June 4, 2018) (quoting *Cerberus*, 794 A.2d at 1152).
[49] *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 678 (Del. 2013) ("failure to read the Disputed Agreements does not bar [a party] from seeking to reform those agreements").

14

read the contracts and agreed to be bound by them.[50]  As discussed above, in the lead-up to signing the Peralta JVA, the parties felt time-pressured to determine decision-making control for the project.  As such, they decided that each party would have input, but delegated ultimate authority to Goldenberg alone.  When it came time to discuss the next project, the Old Oakland Joint Venture, 11 West's new counsel, Schulte, discarded the Peralta JVA and started anew.  It produced a draft JVA that provided Gonzalez, Goldenberg, and Eisenstat each with equal decision-making authority.  The parties all signed the Old Oakland JVA, and 11 West's counsel duplicated its terms in the JVAs for the next two projects.

Even assuming, as I do, that the Majority Members were mistaken regarding the terms of the three JVAs prepared by Schulte, I find that the Majority Members have not met their burden of demonstrating that Gonzalez was mutually mistaken, or that he knew of the Majority Members' mistake and remained silent.  To the contrary, I find that Gonzalez read the three JVAs before signing, and concluded that equal decision-making authority was the parties' agreed-to solution in the debate over control.  Thus, Gonzalez did not believe that the JVAs in question gave Goldenberg control, nor did he realize that the Majority Members so believed or intended—an opinion bolstered by his knowledge that Eisenstat, like Gonzalez, benefitted from shared control.  Moreover, Eisenstat and Goldenberg both signed

---

[50] *See* JX 59, Subexs. A–D.

each of the JVAs, acknowledging that they had read the contracts and agreed to be bound by them,[51] which undercuts the notion that Gonzalez might have believed the Majority Members were mistaken. For this reason alone, reformation is not available to the Majority Members.

**B.**     *There Was No Meeting of the Minds Regarding Goldenberg's Control*

The Majority Members have likewise failed to demonstrate that there was a meeting of the minds between the parties that Goldenberg would have ultimate decision-making control over the Old Oakland Joint Venture, the West Grant Joint Venture, and the American Steel Joint Venture. The parties communicated to Schulte that they wanted to model the three projects' JVAs off of the Peralta JVA; however, as discussed above, the parties had been unsatisfied with their counsel for the Peralta JVA. Thus, while the parties clearly intended the Peralta JVA to provide guidance to Schulte in drafting the three subsequent JVAs, it does not follow that the parties all intended the specific control provisions of the Peralta JVA to be binding—particularly where those control provisions had been the subject of much debate in the time-sensitive period before signing the Peralta JVA. Even if Schulte were instructed to make the new JVAs as similar as possible to the Peralta JVA, that does not mean that there was meeting of the minds that the Peralta JVA's *control* provisions should continue to apply.

---

[51] *See id.*

16

The Majority Members also submit that the language in the subscription agreements shows that the parties intended Goldenberg to have ultimate control.[52] The subscription agreement language communicates to investors that sole decision-making authority resides with Goldenberg in the event of a deadlock. Read in connection with the relevant JVAs, this certainly creates an ambiguity as to the parties' intent. Identifying an ambiguity is not sufficient to determine the parties' intent; to the contrary, it literally shows that the parties' intent is uncertain.[53] I note, moreover, that the next sentence of the subscription agreement contains a warning that deadlock may nevertheless occur; thus, the subscription agreement itself is ambiguous.[54]

To the extent that the subscription agreements told subscribers to expect that Goldenberg's decision would resolve any deadlock, that is certainly some evidence of the parties' understanding of the JVAs. Nevertheless, examining the record as a whole, I do not find it to constitute clear and convincing evidence, for the reasons described above. The Managing Members have failed to show entitlement to reformation.

---

[52] *See* Goldenberg's and Eisenstat's Post-Hearing Brief in Support of Reformation, at 14.

[53] Ambiguity is defined as "uncertainty of meaning or significance," or "the condition of being understood in more than one way." *Ambiguity*, Merriam-Webster's Third New International Dictionary (3d ed. 2002).

[54] JX 91, at MAJ039916.

## III. CONCLUSION

For the foregoing reasons, the Petition for Reformation is denied. An appropriate order is attached.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| IN RE 11 WEST PARTNERS, LLC | ) Consolidated |
|---|---|
| | ) C.A. No. 2017-0568-SG |

## <u>ORDER</u>

AND NOW, this 20th day of March, 2019,

The Court having considered the Petition for Reformation, and for the reasons set forth in the Memorandum Opinion dated March 20, 2019, the Petition is hereby DENIED.

SO ORDERED:

*/s/ Sam Glasscock III*

Sam Glasscock III