# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HARTFIELD, TITUS & DONNELLY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0690-BWD |
| MARKETAXESS HOLDINGS, INC., | ) ) | |
| Defendant. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 24, 2025
Date Decided: July 23, 2025

Kevin J. Mangan, WOMBLE BOND DICKINSON (US) LLP, Wilmington, DE; OF COUNSEL: Douglas G. Bonner, Susan V. Metcalfe, POTOMAC LAW GROUP, PLLC, Washington, D.C.; *Attorneys for Plaintiff Hartfield, Titus & Donnelly, LLC*.

David E. Wilks, D. Charles Vavala III, WILKS LAW LLC, Wilmington, DE; OF COUNSEL: Jeffrey S. Boxer, CARTER LEDYARD & MILBURN LLP, New York, NY; *Attorneys for Defendant MarketAxess Holdings, Inc*.

**DAVID, V.C.**

In September 2020, Hartfield, Titus & Donnelly, LLC ("Plaintiff" or "HTD") and MarketAxess Holdings, Inc. ("Defendant" or "MKTX") entered into a membership interest purchase agreement under which MKTX acquired HTD's municipal bonds trading platform. The parties negotiated a purchase price that included an up-front cash payment and the opportunity for HTD to earn multiple earnout payments over a three-year period. Seeking to structure the earnout to incentivize HTD to remain a major client of the platform, the parties negotiated an earnout structure under which HTD would receive earnout payments if it achieved targets under two separate "scenarios." Under one of the scenarios, HTD could receive an earnout by achieving targets measured by the amount of annual system license fees HTD paid MKTX to use the acquired platform during the earnout period, with a maximum earnout target of $3,250,000 in system license fees. The agreement also provided that if HTD paid "greater than $2,750,000, but less than $3,250,000," in system license fees, HTD could elect to pay an amount in cash to "top up" to the maximum $3,250,000 earnout target.

Several months later, HTD and MKTX amended the membership interest purchase agreement to, among other things, decrease the cash component of the deal consideration and shorten the length of the earnout period from three to two years. When the parties agreed on an April 9, 2021 closing, HTD asked how a mid-month closing would affect the earnout calculation. MKTX proposed some "easy fixes,"

1

including to "[s]tart the earnout measurement from April 9th" and "simply adjust the [earnout] table so that the system license fee target figures are 356/365ths of the figures expressed in the table today." HTD agreed to that approach, and its outside legal counsel drafted a proposed amendment that prorated the system license fee earnout targets for the first earnout period. After exchanging several drafts, the parties executed the amendment. The parties did not think to similarly prorate the minimum threshold triggering HTD's ability to pay cash to "top up" to the maximum prorated earnout target.

At the end of the first earnout period, the system license fees fell short of the $2,750,000 cash top-up threshold by less than ten thousand dollars, and HTD took the position that the parties had "mistakenly" failed to prorate the cash top-up threshold, as they had done for the system license fee earnout targets in the amendment. MKTX denied that was a mistake. HTD then filed this litigation, seeking to reform the membership interest purchase agreement to prorate the cash top-up threshold.

HTD advances two theories in support of reformation—mutual mistake and unilateral mistake. Under either theory, HTD must prove by clear and convincing evidence that the parties reached a specific prior understanding that the cash top-up threshold would be prorated. Based on the evidence adduced at a four-day trial, the

Court finds HTD has failed to meet that burden. The Court therefore enters judgment in favor of MKTX.

## I. BACKGROUND

The following facts are as the Court finds them following a four-day trial held from March 31 through April 3, 2025.[1]

### A. MKTX And HTD Negotiate A Transaction Through Which MKTX Will Acquire MuniBrokers, LLC.

HTD is an interdealer broker that provides services in municipal securities, corporate bonds, and mortgage-backed securities.[2] Prior to April 2021, HTD owned MuniBrokers, LLC, a limited liability company that owned and operated an electronic trading platform for municipal bonds called MuniBrokers (the "MuniBrokers Platform").[3] MKTX is a financial technology company that operates institutional electronic trading platforms.[4]

In 2020, HTD and MKTX negotiated a transaction through which MKTX acquired MuniBrokers, LLC from HTD (the "Transaction").[5] The MuniBrokers Platform derives value from the volume of trades made on the platform, and HTD

---

[1] The Joint Submission of Pretrial Order is cited as "PTO ¶ __". Trial testimony is cited as "Tr. (Witness) at __". Joint exhibits are cited as "JX __" unless otherwise defined.

[2] *See* PTO ¶ 1; Tr. (Purpora) 5:19–6:18.

[3] PTO ¶¶ 1, 34.

[4] *Id.* ¶¶ 3–4; *see also* Tr. (Concannon) 456:7–10.

[5] Tr. (Purpora) 21:9–14.

was a major client.[6]  MKTX therefore sought to ensure that HTD would continue to use the MuniBrokers Platform after MKTX acquired it.[7]

The parties negotiated a purchase price that included an up-front cash payment and the opportunity for HTD to earn multiple earnout payments over a three-year period.  Under HTD's ownership, the MuniBrokers Platform employed a subscription fee model in which it charged annual system license fees to users, but MKTX's strategic plan for the platform included converting those subscription fees to a transaction-based model.[8]  To incentivize HTD to continue using the MuniBrokers Platform after the Transaction, the parties negotiated an earnout structure under which HTD would receive earnout payments if it achieved targets under two separate "scenarios" measured by (1) the amount of annual system license fees HTD paid MKTX to use the MuniBrokers Platform during an earnout period, and (2) the volume of electronic orders HTD placed on the MuniBrokers Platform during an earnout period, based on a percentage of the volume of orders that HTD placed on the platform in 2019 prior to the Transaction.[9]

---

[6] *Id.* at 25:6–27:6, 58:3–4, 226:19–20.

[7] *Id.* at 25:22–24, 79:4–8; *see also* Tr. (Concannon) 502:1–11.

[8] JX 2 at 2.

[9] JX 30; JX 89; Tr. (Purpora) 71:17–72:1; *see also* JX 16.

4

**B.** **The Parties Exchange Term Sheets Over The Earnout Structure.**

Throughout February, March, and April 2020, the parties exchanged at least seven term sheets (titled "Non-Binding Heads of Terms") proposing the terms of the Transaction, including the structure of the earnout.[10] Negotiations over the earnout focused primarily on (1) how the maximum $25 million earnout would be allocated between the system license fee targets and the electronic order targets, and (2) the circumstances under which HTD would be permitted to make a cash payment to MKTX to make up for a shortfall if it failed to achieve the maximum earnout target. This memorandum opinion refers to the latter concept as a "Cash Top-Up Option."

On February 7, 2020, MKTX sent HTD an initial term sheet proposing a purchase price of $20 million at closing plus "[u]p to $20-25 million subject to [an] Earn-out[,]" "calculated based on metrics to be agreed (such as dollar value of HTD order flow on the Munibrokers System, revenue and electronic trading volume) over the three-year period following Closing[,]" where "[t]he annual target for 100% payout of the earning w[ould] be based on HTD's results of operations for 2019."[11]

---

[10] *See* JX 3 (February 7, 2020 Non-Binding Heads of Terms); JX 5 (March 13, 2020 Non-Binding Heads of Terms); JX 8 (March 19, 2020 Non-Binding Heads of Terms); JX 10 (March 23, 2020 Non-Binding Heads of Terms); JX 14 (March 26, 2020 Non-Binding Heads of Terms); JX 251 (April 1, 2020 Non-Binding Heads of Terms); JX 22 (April 16, 2020 Non-Binding Heads of Terms).

[11] JX 3 at 2.

In response to MKTX's proposal of a "[c]ombined earn-out matrix based off of order flow and electronic orders as a percentage of total[,]"[12] HTD counter-proposed structuring the earnout so that HTD could earn a maximum of $20 million by achieving system license fee targets—with the ability to pay "[a]ny shortfall . . . on a dollar for dollar basis"—and the remaining $5 million by achieving electronic order targets, for a total potential earnout of $25 million.[13] MKTX responded with an "[u]pdated [p]roposal" that included an earnout structure in which HTD could earn a maximum of $12.5 million by achieving system license fee targets and another $12.5 million by achieving electronic order targets.[14]

On March 23, HTD sent MKTX a "Non-Binding Heads of Terms" (the "March 23 Term Sheet") proposing an earnout structure in which HTD could earn a maximum of $18 million by achieving system license fee targets, "***with any annual shortfall covered by HTD***," and another $7 million by achieving electronic order targets.[15] MKTX responded by "[c]hanging the mix of the earn-out value assigned

---

[12] JX 8 at 12.

[13] JX 7 at 3.

[14] JX 8 at 14.

[15] JX 10 at 1 (emphasis added). HTD negotiated an earnout structure that placed greater value on system license fees because HTD was more confident in its ability to achieve the system license fees targets than the electronic order targets. Tr. (Purpora) 63:19–64:19; *id.* at 68:1–3.

to the two components to $15 million for the processing fee and $10 million for the electronic contribution."[16]

On March 28, MKTX internally discussed HTD's request to cover "any shortfall" if it failed to reach an earnout target (*i.e.*, HTD's request for a Cash Top-Up Option).[17] MKTX rejected the concept of an un-cabined Cash Top-Up Option because MKTX valued the MuniBrokers Platform based on expected revenue streams and getting "cash in lieu of revenues was not something [MKTX] w[as] looking to buy."[18]

After further discussions, MKTX's Manager of Corporate Development, Tagg Martin, circulated a presentation to MKTX's deal team that summarized the "[o]verage" and "[c]atch-up" provisions the parties had negotiated:

- Any overages can be applied to any other year to the extent there is shortfall to the annual $3.25mm

---

[16] JX 14 at 1.

[17] *See* JX 15 (email from MKTX's President and Chief Operating Officer, Chris Concannon, to MKTX's Chief Financial Officer Tony DeLise, General Counsel Scott Pintoff, and Manager of Corporate Development Tagg Martin, giving an update on the parties' negotiations over the earnout structure, noting, among other items, that "[i]f [HTD] [is] short in a year by less than $0.5 [million] and they maintain electronic [bids] of 84% or more, they can also pay to hit the $3.25 [million]" system license fee maximum earnout target).

[18] Tr. (Pintoff) 935:10–936:22; *see also* JX 19 (April 2, 2020 email from Concannon to Purpora explaining that "[i]f you are truing up multiple year[s] th[e]n that's not an earnout").

7

– If any year HTD pays above $2.75mm and below $3.25mm, but maintains 84% electronic order flow percentage, then HTD can pay on a dollar for dollar basis the System License Fee difference to $3.25mm to achieve full earn-out[.][19]

On April 1, MKTX sent HTD a new term sheet explaining that, for the system license fee component of the earnout:

Earnout 1 will require HTD to pay aggregate System License Fees of $9.75 million over three years in order to be paid 100% of the $17 million earnout. If, in any of the first three years following the Closing, HTD pays System License Fees in excess of $3.25 million, any overage can be applied to any other year to the extent there is shortfall to the annual $3.25 million System License Fee target in such year. Notwithstanding the foregoing, in no event will MarketAxess be required to pay an earnout of more than $5.67 million per year for Years 1 and 2, even if HTD pays System License Fees in excess of $3.25 million in one or both of such years.

In addition, *if HTD pays greater than $2.75 million, but less than $3.25 million, of System License Fees in any of the first three years following the Closing, then HTD shall have the option of paying MarketAxess the shortfall to $3.25 million in cash on a dollar for dollar basis*, provided, however, this option shall only be available to HTD if (A) the metric for earnout 2 is equal to or greater than 84% for such year or (B) in the event that the metric for earnout 2 is less than 84% for such year, then either (i) the metric averages over 84% for the full three-year period following Closing or (ii) the metric is greater than 83% but less than 84% for such year, provided, however, in this case, *HTD may only pay MarketAxess a shortfall of $250,000 or less on a dollar for dollar basis*. In the event that HTD exercises this option, then the actual amount of System License Fees plus the amount of the additional payment by HTD shall be counted as the amount of System License Fees for purposes of determining the earnout percentage.[20]

---

[19] JX 16 at 5.

[20] JX 251 at 4 (emphasis altered from original).

The Chairman of HTD's board of directors, Ron Purpora, confirmed his understanding of MKTX's proposal for the Cash Top-Up Option:

> [S]o let me see if I understand these tru-up conditions; if we average 84% or better in the 3 year earn-out, then we get to tru-up by a max 500k any given year of the fee structure that is $2.750[;] however, if the 3 yr average is between 83 and 83.9 then we can tru-up ONLY 1 year of the fee structure that is 2.750 or better by no more than $250k.[21]

MKTX agreed, and Purpora told HTD's deal team: "we have a deal. I wasn't going to press the 83-83.9 tru-up opportunity when I don't think it[']s going to be a likely scenario in the long run. [S]o long as we have the 84 or better tru-up for 500k in all 3 years above $2.750, I think we'd be endangering a good deal for a 1 in 50 scenario."[22] On April 2, HTD told MKTX, "[w]e believe we are there with intent (at a level 2.75m+, 84%+ ave gets 500k catchup, 83-84% ave gets 250k catchup)."[23]

On April 16, MKTX and HTD executed a "Non-Binding Heads of Terms" (the "April 16 Term Sheet").[24] The April 16 Term Sheet contemplated a transaction in which MKTX would acquire "100% of the equity interests in Munibrokers from HTD for the Purchase Price[,]" comprising $20 million at closing and up to $25

---

[21] JX 19 at 1.

[22] *Id.*

[23] JX 251 at 1.

[24] JX 22.

million subject to a three-year earnout.[25]   The April 16 Term Sheet contemplated that HTD could earn up to $17 million by achieving the following system license fee targets:[26]

| Transaction Fees per Annum | | | | | |
|---|---|---|---|---|---|
| **Total Transaction Fees per Annum** | **Annual Amount Paid** | | | | **Total Dollar Value** |
| | **Year 1** | **Year 2** | **Year 3** | **Payout %** | |
| **Below $2.50m** | $0.00m | $0.00m | $0.00m | **0%** | **$0.00m** |
| **$2.50m** | $1.42m | $1.42m | $1.42m | **25%** | **$4.25m** |
| **$2.75m** | $2.83m | $2.83m | $2.83m | **50%** | **$8.50m** |
| **$3.00m** | $4.25m | $4.25m | $4.25m | **75%** | **$12.75m** |
| **$3.25m** | $5.67m | $5.67m | $5.67m | **100%** | **$17.00m** |

The April 16 Term Sheet further contemplated that HTD could earn up to an additional $8 million by achieving the following electronic order targets:[27]

| Electronic Bid-Wanted Orders Submitted as Percent of Total | | | | | |
|---|---|---|---|---|---|
| **Electronic % of Total** | **Annual Amount Paid** | | | | **Total Dollar Value** |
| | **Year 1** | **Year 2** | **Year 3** | **Payout %** | |
| **Below 80%** | $0.00 | $0.00 | $0.00 | **0%** | **$0.00m** |
| **80%** | $2.00 | $1.25 | $0.75 | **50%** | **$4.00m** |
| **84%** | $3.00 | $1.88 | $1.13 | **75%** | **$6.00m** |
| **86%** | $4.00 | $2.50 | $1.50 | **100%** | **$8.00m** |

The April 16 Term Sheet also contemplated the following Cash Top-Up Option:

> if HTD pays greater than $2.75 million, but less than $3.25 million, of System License Fees in any of the first three years following the

---

[25] *Id.* at 7.

[26] *Id.* at 17.

[27] *Id.*

Closing, then HTD shall have the option (within 45 days following the end of such year) of paying MarketAxess the shortfall to $3.25 million in cash on a dollar for dollar basis, provided, however, this option shall only be available to HTD if (A) the metric for earnout 2 is equal to or greater than 84% for such year or (B) in the event that the metric for earnout 2 is less than 84% for such year, then either (i) the metric averages over 84% for the full three-year period following Closing or (ii) the metric is greater than 83% but less than 84% for such year, provided, however, in this case, HTD may only pay MarketAxess a shortfall of $250,000 or less on a dollar for dollar basis.[28]

## C. HTD And MKTX Execute The MIPA.

On September 10, 2020, MKTX and HTD executed a Membership Interest Purchase Agreement ("MIPA") under which MKTX purchased HTD's interests in MuniBrokers, LLC.[29] In connection with the MIPA, MKTX and HTD also entered into a Software License and Access Agreement, under which HTD agreed to license the MuniBrokers Platform from MKTX following the Transaction.[30]

The MIPA contemplates a purchase price of $20 million at closing, "plus the aggregate amount of the Earnout Payments, if any, that become payable pursuant to Section 1.5."[31] Under Section 1.5, HTD shall receive an "Earnout Payment," "if any, equal to the sum of (i) the **System License Fee Earnout Payment**, if any, *plus*

---

[28] *Id.* at 8 (emphasis omitted).

[29] JX 28 [hereinafter MIPA].

[30] *Id.*, Ex. A [hereinafter HTD Agt.].

[31] *Id.* § 1.2.

(ii) the **Order Flow Earnout Payment**, if any, for such Earnout Calculation Period,

in each case, as finally determined in accordance with this Section 1.5."[32]

### 1. The System License Fee Earnout Payment

Under the MIPA, "System License Fees" refer to the per ticket fees that an

HTD user has paid for each municipal bond trade submitted or executed on the

MuniBrokers Platform during the relevant period.[33]

> "**System License Fee Earnout Payment**" means, with respect to any Earnout Calculation Period, if the **Adjusted System License Fees** for such Earnout Calculation Period . . . :
>
> (i) are less than $2,500,000, an amount equal to $0;
> (ii) are equal to or greater than $2,500,000, but less than $2,750,000, an amount equal to $1,420,000;
> (iii) are equal to or greater than $2,750,000, but less than $3,000,000, an amount equal to $2,830,000;
> (iv) are equal to or greater than $3,000,000, but less than $3,250,000, an amount equal to $4,250,000; and
> (v) are equal to or greater than $3,250,000, an amount equal to $5,670,000.[34]

Thus, the "System License Fee Earnout Payment" is a function of the "System

License Fees" HTD has paid, subject to various adjustments:

> "**Adjusted System License Fees**" means, for any Earnout Calculation Period, an amount equal to: (i) the System License Fees for such Earnout Calculation Period as finally determined pursuant to Section

---

[32] *Id.* § 1.5(a) (bold emphasis added) (italicized emphasis in original).

[33] *Id.* § 10.1 (definition of "System License Fee"); HTD Agt. § 3.1.1.

[34] MIPA § 10.1 (definition of "System License Fee Earnout Payment") (emphasis altered from original).

1.5(b), *plus* (ii) the amount, if any, of the **Excess License Fees** to be included as finally determined in accordance with Section 1.5(c), *plus* (iii) the **Cash Top-Up Amount**, if any, to be paid by the Seller as finally determined in accordance with Section 1.5(c).[35]

"Excess License Fees" refers to System License Fees that HTD pays during the earnout periods exceeding certain thresholds.[36]

Section 1.5(e)(i) of the MIPA governs the Cash Top-Up Option. That section states that:

> To the extent that (A) the Electronic Order Percentage for any Earnout Calculation Period (as finally determined pursuant to Section 1.5(b)) is equal to or greater than 84% and (B) the amount of the System License Fees actually paid by the Seller in such Earnout Calculation Period (as finally determined pursuant to Section 1.5(b)) *is equal to or greater than $2,750,000, but less than $3,250,000*, the Seller shall be entitled to elect to pay an amount in cash up to the amount that would cause the Adjusted System License Fees for such Earnout Calculation Period (after taking into account any Excess License Fees to be included for such period in accordance with Section 1.5(d)) to be equal to $3,250,000, by delivering a Cash Top-Up Election in accordance with Section 1.5(c)(i).[37]

This memorandum opinion refers to the $2,750,000 threshold for exercising the Cash Top-Up Option as the "Cash Top-Up Threshold."

Section 1.5(e)(ii) of the MIPA provides that:

---

[35] *Id.* (definition of "Adjusted System License Fees") (bold emphasis added) (italicized emphasis in original).

[36] *Id.* (definition of "Excess License Fees").

[37] *Id.* § 1.5(e)(i) (emphasis added).

13

Without limiting Section 1.5(e)(i), but subject to the proviso below and to the satisfaction of the requirements set forth in Section 1.5(e)(i)(B) in respect of the applicable Earnout Calculation Period, to the extent that (A) the Electronic Order Percentage for any Earnout Calculation Period (as finally determined pursuant to Section 1.5(b)) is greater than 83% but less than 84% or (B) the arithmetic mean of the Earnout Order Percentages for the three Earnout Calculation Periods (each as finally determined pursuant to Section 1.5(b)) is greater than 84%, the Seller shall be entitled to make a Cash Top-Up Election; provided that the Seller shall be entitled to make such a Cash Top-Up Election with respect to one (but in no event more than one) Earnout Calculation Period and pursuant to either clause (A) or clause (B) and not both, and the Cash Top-Up Amount with respect to any such Cash Top-Up Election shall not exceed an amount equal to $250,000.[38]

### 2. The Order Flow Earnout Payment

"Electronic Order Percentage" refers to the aggregate number of bid-wanted orders submitted electronically to or by HTD through the MuniBrokers Platform in an earnout period ("Electronic Order Flow"), divided by the total number of bid-wanted orders in the period ("Total Order Flow"), and multiplied by 100.[39] Under the MIPA, the "Order Flow Earnout Payment" for each earnout period is as follows:[40]

---

[38] *Id.* § 1.5(e)(ii) (emphasis omitted).

[39] *Id.* § 10.1 (definition of "Electronic Order Percentage"); *id.* (definition of "Electronic Order Flow"); *id.* (definition of "Total Order Flow").

[40] *Id.* (definition of "Order Flow Earnout Payment").

| Electronic Order Percentage | First Earnout Calculation Period | Second Earnout Calculation Period | Third Earnout Calculation Period |
|---|---|---|---|
| Less than 80% | $0.00 | $0.00 | $0.00 |
| Equal to or greater than 80%, but less than 84% | $2,000,000 | $1,250,000 | $750,000 |
| Equal to or greater than 84%, but less than 86% | $3,000,000 | $1,880,000 | $1,130,000 |
| Equal to or greater than 86% | $4,000,000 | $2,500,000 | $1,500,000 |

### 3.    The Earnout Procedures

Section 1.5(b) of the MIPA includes procedures for determining and, if necessary, disputing whether HTD is entitled to an earnout payment.[41]

Section 1.5(b)(i) sets a deadline for MKTX to provide HTD with a "Preliminary Earnout Statement" setting forth "in reasonable detail" its calculations of the System License Fees, any System License Fee Earnout Payment based thereon, the Electronic Order Flow and Total Order Flow, and any Order Flow Earnout Payment based thereon.[42] Section 1.5(b)(ii) then provides HTD thirty days to deliver an "Earnout Objection Statement" setting forth any objections to the Preliminary Earnout Statement.[43] Section 1.5(c) sets a deadline of fifteen days following a final determination of the Preliminary System License Fee Earnout

---

[41] *Id.* § 1.5(b).

[42] *Id.* § 1.5(b)(i).

[43] *Id.* § 1.5(b)(ii).

Payment and the Order Flow Earnout Payment for HTD to deliver an "Earnout Adjustment Statement" (A) setting forth the amount of any Excess License Fees to include in the calculation of the Adjusted System License Fees, (B) electing to exercise the Cash Top-Up Option, and (C) "setting forth [HTD]'s calculation of the Adjusted System License Fees and the System License Fee Earnout Payment based thereon."[44]

## D. The Parties Amend The MIPA.

After signing, HTD was unable to obtain third party consents to provide data necessary to operate the MuniBrokers Platform. In particular, upon learning of the Transaction, Intercontinental Exchange ("ICE") claimed that MuniBrokers had breached various contracts with ICE by "redistributi[ng]" data, resulting in a $2.6 million settlement.[45] In turn, MKTX took the position that ICE's claims against HTD breached multiple representations in the MIPA, including that HTD held all intellectual property licenses necessary to conduct its business.[46] MKTX nevertheless agreed to "explore potential solutions with both [HTD's] clients and ICE" while "reserv[ing] all . . . rights under the MIPA."[47]

---

[44] *Id.* § 1.5(c)(i).

[45] Tr. (Purpora) 123:3–126:18, 191:21–24; JX 32.

[46] JX 32 at 1.

[47] *Id.*

16

Thereafter, MKTX and HTD negotiated an amendment to the MIPA.  On February 25, 2021, MKTX proposed to reduce the total potential consideration it would pay to acquire MuniBrokers, LLC from $45 million to $42 million, on the basis that "it w[ould] cost [MKTX] more to run the business under [its] umbrella than anticipated and had [MKTX] known this during the negotiations [it] wouldn't have gotten to the $45 million in total consideration."[48]  MKTX therefore proposed to reduce the upfront cash payment in the Transaction by $3 million, but agreed to shorten the earnout period from three to two years so that HTD could earn the $25 million earnout sooner, explaining:

> We don't change the earn out mechanics and simply change the earnout figures for the two components (electronic order flow and license fee) and spread them over two years instead of three years.  The electronic flow earnout target would be $4 million in both year 1 and year 2 (instead of $4 million, $2.5 million and $1.5 million in Years 1, 2 and 3) and the license fee earnout would be $8.5 million in both year 1 and 2 (instead of $5.6 million in years 1, 2 and 3).[49]

HTD accepted MKTX's proposal[50] and the parties agreed on an April 9, 2021 closing.[51]  On March 26, HTD asked MKTX how a mid-month closing would affect

---

[48] JX 33 at 5.

[49] *Id.*

[50] *Id.* at 1.

[51] PTO ¶ 25.

the earnout calculation,[52] suggesting the parties "us[e] [April] 1 as a start date for the earnouts while leaving [April] [9th] as the start date for the balance of the agreement."[53]   On March 29, MKTX's Chief Financial Officer, Tony DeLise, responded with three alternatives, describing the first two as "easy fixes":

> 1. Start the earnout measurement from April 9th and let the first measurement period run through March 31, 2022 and the next period would be a full year from April 1, 2022 to March 31, 2023.  The electronic flow component is unaffected because that is expressed in a percentage figure.  For the system license fee component, we can simply adjust the table so that the system license fee target figures are 356/365ths of the figures expressed in the table today.  We don't change any of the earn-out figures, just the target figures.
>
> 2. Start the earnout measurement calculations effective May 1, 2021 and run for each of the two years ended April 30, 2023.
>
> We would also find it acceptable to not change anything and run calculations beginning with the effective date of the closing.[54]

HTD decided that "option # 1 [wa]s the one to go with."[55]

On March 30, HTD's outside counsel at Faegre Drinker Biddle & Reath LLP ("Outside Counsel") sent Purpora a draft amendment to the MIPA, noting that "the proration should be 357 days out of 365 days" and that Outside Counsel was

---

[52] *Id.* ¶ 26.

[53] JX 53 at 3.

[54] *Id.* at 2.

[55] PTO ¶ 28.

"continuing to scrub the docs to make sure there's nothing else implicated by this change."[56]

HTD contends that, despite its commitment to "scrub" the draft amendment, Outside Counsel failed to comprehensively review the MIPA and overlooked the need to amend the Cash Top-Up Option to prorate the Cash Top-Up Threshold. The parties never discussed prorating the Cash Top-Up Threshold,[57] and although HTD and MKTX exchanged at least four drafts of the amendment, none included language prorating the Cash Top-Up Threshold.[58]

On April 9, MKTX and HTD executed "Amendment No. 1" to the MIPA (the "Amendment").[59] The Amendment amended the definition of "First Earnout

---

[56] JX 56 at 1.

[57] *See, e.g.*, Tr. (Purpora) 387:14–388:16 (Purpora testifying that he was not aware of any communications between HTD and MKTX about prorating the Cash Top-Up Threshold); Tr. (Concannon) 483:16–24 (Concannon testifying that HTD never communicated to him prior to April 1, 2022 that it believed the Cash Top-Up Threshold should be prorated); Tr. (Martin) 594:14–17 (Martin testifying that he did not communicate with HTD about prorating the Cash Top-Up Threshold before executing the Amendment); Tr. (Caldas) 702:8–13 (MuniBrokers President Jay Caldas testifying that he did not communicate with MKTX about whether the Cash Top-Up Threshold had or had not been prorated); Tr. (Meiseles) 807:8–18 (HTD's Outside Counsel testifying that he did not have any communications with MKTX, its inside or outside counsel, or HTD about prorating the Cash Top-Up Threshold prior to closing on April 9, 2021); Tr. (Pintoff) 985:5–9 (Pintoff testifying that no one at HTD or its counsel ever mentioned prorating the Cash Top-Up Threshold prior to closing).

[58] *See, e.g.*, JX 61 (March 31, 2021 email attaching HTD draft amendment); JX 70 (April 6, 2021 email attaching MKTX draft amendment); JX 73 (April 7, 2021 email attaching HTD draft amendment); JX 78 (April 8, 2021 email attaching HTD draft amendment).

[59] PTO ¶ 33.

Calculation Period" to mean "the period commencing on [the April 9, 2021 closing date] and ending on March 31, 2022[,]"[60] and amended the definition of "System License Fee Earnout Payment" to mean, if the Adjusted System License Fees for such Earnout Calculation Period:

(i) are less than $2,438,356.16, an amount equal to $0;

(ii) are equal to or greater than $2,438,356.16, but less than $2,682,191.78, an amount equal to $2,125,000;

(iii) are equal to or greater than $2,682,191.78, but less than $2,926,027.40, an amount equal to $4,250,000;

(iv) are equal to or greater than $2,926,027.40, but less than $3,169,863.01, an amount equal to $6,375,000; and

(v) are equal to or greater than $3,169,863.01, an amount equal to $8,500,000[.][61]

The Amendment did not amend the Cash Top-Up Threshold in the Cash Top-Up Option.

The Transaction closed on April 9, 2021.[62]

### E. HTD Studies The Cash Top-Up Option But Fails To Notice That The Amendment Did Not Prorate The Cash Top-Up Threshold.

Months after the Transaction closed, HTD internally discussed the mechanics of the Cash Top-Up Option. On June 9, 2021, Purpora asked HTD's General Counsel, Ed Smith, about the circumstances under which HTD was entitled to

---

[60] JX 193 § 1(l) (definition of "First Earnout Calculation Period").

[61] *Id.* § 1(q) (definition of "System License Fee Earnout Payment").

[62] PTO ¶ 34.

exercise the Cash Top-Up Option.[63] Smith explained that "[HTD] can do the Top-Up Option in 1.5(e)(i) in any Earn-Out Calculation Period when Electronic Order Percentage (EOP) is greater than 84% and *System license Fees paid by [HTD] are at least $275K* as discussed."[64] Purpora "agree[d] with [Smith's] interpretations."[65]

Months later, on September 8, Smith asked HTD's Outside Counsel to confirm his understanding that "if the System license fees paid are less than *$2,750,00[0]*, HTD could not use the top-up provision[.]"[66] Specifically, HTD wondered whether "the top-up provision allow[ed] [it] to top-up in the amount of $500K to get to the $3,250,000 if [its] percentage [wa]s 84% or greater?"[67] In other words, HTD wanted to know, if it failed to hit the Cash Top-Up Threshold, whether it could use cash to top-up to the Cash Top-Up Threshold. HTD's Outside Counsel explained that it could not:

> The short answer to your below follow up question is "no"—this point is addressed in Section 1.5(e)(ii), which was restated in the Amendment, and provides that, if other requirements are satisfied, a Cash Top-Up Election can be made with respect to either (but not both) of clause (A) or (B) of Section 1.5(e)(ii), but cannot in either case exceed $250k. Please see highlighted language below.

---

[63] *See* JX 92.

[64] JX 93 at 1 (emphasis added).

[65] JX 94 at 1.

[66] JX 96 at 2 (emphasis added).

[67] JX 98 at 2.

To your earlier question, we agree with you that if the System License Fees paid are less than ***$2,750,000***, HTD cannot use the top-up provision at all, as Section 1.5(e)(i)(B) will not be satisfied.[68]

On September 9, Purpora conveyed to the HTD team that the "bogie" to hit for any "top-off option" is "***$2,750*** in ticket fees."[69] Again, HTD did not raise concern that the Amendment did not prorate the Cash Top-Up Threshold.

## F. HTD Realizes That The Cash Top-Up Threshold Was Not Prorated.

Three months later, on December 8, 2021, Purpora inexplicably sent an email to an HTD employee stating, "keep in mind $2,682 gives us the ability to 'top-off' to achieve the max[.]"[70] At trial, Purpora could not explain why, in September, HTD believed the Cash Top-Up Threshold was $2,750,000, but by December, it believed the Cash Top-Up Threshold was $2,682,000.[71]

On March 7, 2022, Purpora sent another email to HTD employees stating that "[t]hat boogie we need to achieve is $2,682,000 and we are currently on pace to beat

---

[68] *Id.* at 1 (emphasis added).

[69] JX 101 at 1 (emphasis added).

[70] JX 104.

[71] Tr. (Purpora) 250:15–23 ("Q. Okay. Did anything occur between that last email in Exhibit 101 in September and this one to alert you that the top-off—I mean, had your review changed about that? Why is there that difference? A. No. One was the mechanics of the—the September email was the mechanics of the top-off. This is the discussion between the actual numbers that we needed to hit against the adjusted system licensing fees.").

that number by just $16k!"[72]  Again on March 16, Purpora told HTD employees that "the number we need to achieve in ticket fees by Mar[ch] 31 is $2,682,200—which is a pro-rated number of annual target of $2,750,00[0] because the 1[st] year earnout is short 7 trading days."[73]

HTD contends that it first discovered that the Amendment did not prorate the Cash Top-Up Threshold on March 29, 2022.[74]  That day, Smith emailed HTD's Outside Counsel:

> Section 1.5(e)(i) - Cash Top-Up Option - does not appear in Amendment 1 to the MIPA.  (e)(i) addresses the Top-Up where we can pay MA up to $500K if our electronic order percentage is equal to or grater than 84% and our System License Fees actually paid are between $2,750,000 and $3,250,000.
>
> In Amendment 1 to the MIPA (page 5) the definition of System License Fee Earnout Payment for the first Earnout Period was amended to reflect the pro-rated figures resulting from the April 9[th] close, which is $3,169,863.01 instead of $3,250,000.  How do (or should?) these revised figures affect the Top-Up guidelines in 1.5(e)(i)? We are of the understanding that the Top-Up option would pro-rate with the new target License Fees. 1.5(e)(i) appears to allow for us to Top-Up in an amount up to the full spread of the next-to-last bracket in the System License Fee Earnout Payment definition up to the maximum stated System License Fee in order to achieve the full payment.

---

[72] JX 109.

[73] JX 110.

[74] POB at 10.

Can you please take a look at the original MIPA (Section 1.5(e)) and also the revised related definitions regarding the System License Fee Earnout Payment and let us know what your views are on this?[75]

HTD contends that when it spoke with its Outside Counsel the next day, Outside Counsel admitted that "everyone missed" the Cash Top-Up Threshold when preparing the Amendment.[76]

Although HTD purportedly believed that "everyone missed" the issue, HTD did not directly raise the issue with MKTX. Instead, on April 1, Purpora emailed MKTX's President and Chief Operating Officer, Chris Concannon, claiming "we hit the pro-rated number to top-off the ticket fee part of the earn-out (with some room to spare)[.]"[77] Concannon, surprised by the concept of a prorated Cash Top-Up Threshold, forwarded Purpora's email to Martin, asking if there was a "disconnect."[78] Martin responded:

I am projecting [HTD] to be at $2,708,000. This would be above the $2,682,000 required for the $4 million pay out, but below the $2,750,000 required to top up. . . . I believe there could be a disconnect between what [Purpora] thinks is required to top up and the earn-out buckets. The document clearly states that they can only top-up if they achieve $2,750,000. However, given the partial year measurement for

---

[75] JX 115 at 2.

[76] JX 182 at 1; Tr. (Purpora) 258:18–22; Tr. (Smith) 914:24–915:4.

[77] JX 120.

[78] JX 121 at 1.

24

the earn-out, he might believe he is able to top up at $2,682,000 or above, but that is incorrect.[79]

MKTX then spoke with HTD's Outside Counsel and, according to Martin, HTD "agreed that [MKTX] w[as] correct in [its] interpretation"[80] but was "eager to hear if [MKTX] would want to explore a new partnership / agreement for them to make up some of the money missed . . . ."[81] Martin remarked that he was "shocked [HTD] [was not] fighting [MKTX] more on it."[82]

### G. The Parties Discuss A New Earnout Structure But Fail To Reach An Agreement.

On May 4, 2022, MKTX delivered to HTD a Preliminary Earnout Statement for the First Earnout Calculation Period, reporting total System License Fees of $2,740,394, entitling HTD to a $4,250,000 earnout payment under the MIPA (as amended).[83] The System License Fees for the First Earnout Calculation Period fell short of the Cash Top-Up Threshold by less than ten thousand dollars. On May 5, Purpora told HTD's Outside Counsel that the Preliminary Earnout Statement was

---

[79] *Id.*

[80] JX 132 at 2.

[81] *Id.*

[82] *Id.*

[83] PTO ¶ 37; JX 138 at 2.

correct "from a pure math standpoint" but that HTD intended to reserve its rights "to argue the Cash Top-off issue."[84]

The same day, Concannon told Purpora that MKTX "owe[d] [HTD] a proposal on a new earnout structure for the next phase of the earnout as we discussed."[85] HTD and MKTX discussed a new earnout structure under which HTD could receive additional compensation for reaching new business targets, though HTD continued to argue that it was entitled to use the Cash Top-Up Option for the First Earnout Calculation Period.[86]

HTD did not deliver a written statement objecting to the Preliminary Earnout Statement and did not purport to exercise the Cash Top-Up Option. On May 18, HTD received a $4,250,000 payment for the First Earnout Calculation Period.[87]

On July 18, HTD proposed a "simple amendment to the MIPA that recognize[d] and correct[ed] the drafting error[,]" which MKTX rejected.[88] On August 23, MKTX made a proposal that would require HTD to perform additional

---

[84] JX 138 at 1.

[85] JX 141 at 2.

[86] *See* PTO ¶ 38.

[87] PTO ¶ 42; JX 143 at 1; Tr. (Pintoff) 1023:23–1024:2.

[88] JX 162 at 1.

services to earn an additional earnout amount, which HTD rejected.[89] MKTX's

Richard Schiffman wrote in a December 2 internal email:

> Before we agree to work with [Purpora] to "resolve this issue" as he says, he has to first acknowledge that 1) the issue is of their doing . . . they made a mistake—a very costly and unfortunate mistake, but that's what is; 2) we're good partners and feel bad about what happened so we're willing to come up with creative solutions for them to \***earn**\* back the money that they lost. He has to get it out of his head that we somehow owe him the money. Until he recognizes that, he's going to be forever disappointed with our solutions.[90]

On January 3, 2023, Concannon told Purpora that, "[i]n the interest of the partnership, we were trying to find a resolution to the unfortunate, but contractual structure of the earn-out in our agreement. . . . I am open to continue the discussion to find a solution."[91]

On March 2, HTD's Outside Counsel advised HTD that "the $2.75 million was not achieved for the First Earnout Calculation Period, and as a result, we do not believe the right to make a Cash Top-Up Election would be available in respect of the First Earnout Calculation Period under Section 1.5(e)(ii)(B)."[92] Outside Counsel noted that, "as we've talked about, we do not think it [is] accurate to say there was a drafting error with respect to the Amendment, and the updated figures that we

---

[89] JX 167.

[90] JX 176 at 1.

[91] JX 178 at 1.

[92] JX 182 at 2.

discussed and were directed to update were revised prior to finalizing the Amendment."[93]  MKTX also denied that there had been "a 'drafting error' in the agreement."[94]

The parties did not reach an agreement on a new earnout structure.[95]

## H.    HTD Files This Lawsuit.

On July 6, 2023, HTD initiated this action through the filing of a Verified Complaint, seeking to reform the MIPA to prorate the Cash Top-Up Threshold.[96] The Court held a four-day trial from March 31 through April 3, 2025.[97]  The parties completed post-trial briefing on June 24.[98]

## II.    ANALYSIS

HTD seeks an order reforming the MIPA to prorate the Cash Top-Up Threshold.  "The Court of Chancery has the power 'to reform a contract in order to express the 'real agreement' of the parties involved.'"  *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *12

---

[93] *Id.*

[94] JX 186 at 1.

[95] PTO ¶ 38.

[96] Dkt. 1.

[97] Dkt. 127.

[98] Pl.'s Initial Post-Trial Br. [hereinafter POB], Dkt. 136; Def. MarketAxess Hldgs., Inc.'s Post-Trial Br. [hereinafter DAB], Dkt. 138; Pl.'s Post-Trial Reply Br. [hereinafter PRB], Dkt. 140.

(Del. Ch. May 16, 2012) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)). "The party seeking reformation 'must prove each of the required elements by clear and convincing evidence.'" *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at \*13 (Del. Ch. June 4, 2018) (quoting *Cerberus*, 794 A.2d at 1152). "This is 'an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt.'" *Id.* (quoting *Cerberus*, 794 A.2d at 1151). "It 'requires evidence that "produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable."'" *Id.* (quoting *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002)). "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt." *Id.* (quoting *Hudak*, 806 A.2d at 147). "Imposing this heightened burden for a claim for reformation 'preserve[s] the integrity of written agreements by making it difficult to modify executed contracts.'" *Id.* (quoting *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at \*13 (Del. Ch. Oct. 20, 2015)).

HTD advances two theories in support of reformation—mutual mistake and unilateral mistake. In a case of mutual mistake, "the plaintiff must show that both parties were mistaken as to a material portion of the written agreement." *Cerberus*, 794 A.2d at 1151 (citing *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980)). In the case of unilateral mistake, "[t]he party asserting th[e] doctrine must show that it was

29

mistaken and that the other party knew of the mistake but remained silent." *Id.*

(citing *Collins*, 418 A.2d at 1002). "Regardless of which doctrine is used, the

plaintiff must show by clear and convincing evidence that the parties came to a

specific prior understanding that differed materially from the written agreement."

*Id.* at 1151–52 (citing *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 857 (Del. 1952)).

"This court has held that a [plaintiff's] 'general understanding' is insufficient to

carry [the] [plaintiff's] burden." *In re Jeremy Paradise Dynasty Tr.*, 2023 WL

1241903, at *11 (Del. Ch. Jan. 31, 2023) (citing *Cantor Fitzgerald, L.P. v. Cantor*,

2000 WL 307370, at *7–9 (Del. Ch. Mar. 13, 2000)). "And a '[party] that has no

belief [at all] is not mistaken.'" *Id.* (quoting *Cerberus*, 794 A.2d at 1155). "Unless

there was a clear understanding with which the formal contract conflicts, there is

. . . no comparative standard upon which to base a reformation, and the contract as

executed must stand." *Glidepath*, 2018 WL 2670724, at *13 (quoting *Hob Tea

Room*, 89 A.2d at 857).

In this action, HTD has failed to meet its burden to prove by clear and

convincing evidence that the parties reached a prior understanding to prorate the

Cash Top-Up Threshold. HTD's claim for reformation therefore fails under either

a mutual or unilateral mistake theory.

HTD argues that when the parties negotiated the Amendment, they "reached

a specific prior understanding to ministerially prorate *all* targets to account for a

shortened initial earnout calculation period[,]" which, according to HTD, included the Cash Top-Up Threshold.[99] But the record evidence shows that the parties never discussed whether, let alone agreed that, the Amendment would prorate the Cash Top-Up Threshold. Both parties point to a March 29, 2021 email from MKTX's Chief Financial Officer, Tony DeLise, proposing three alternatives to address the effect of a mid-month closing on the earnout calculation.[100] HTD accepted MKTX's proposal to "adjust the table so that the *system license fee target figures* are 356/365ths of the figures expressed in the table" but did not mention prorating the Cash Top-Up Threshold.[101] HTD's Outside Counsel then drafted the Amendment, but did not propose language prorating the Cash Top-Up Threshold.[102] Of the four drafts exchanged, none proposed language prorating the Cash Top-Up Threshold.[103] And as negotiators for both HTD and MKTX (including Purpora, Concannon, and

---

[99] POB at 16 (emphasis added).

[100] JX 54.

[101] *Id.* at 1–2 (emphasis added). The "table" referenced in DeLise's March 29, 2021 email refers to the definition of System License Fee Earnout Payment in Section 10.1 of the MIPA, which was reflected in table form in various communications and documents, including, for example, on Exhibit 1 to the April 16 Term Sheet. *See* pp. 10, *supra*.

[102] JX 61; JX 73; JX 78. HTD contests the credibility of HTD's Outside Counsel, who "d[id] not think it accurate to say there was a drafting error with respect to the Amendment . . . ." JX 182 at 2. Even affording little weight to Outside Counsel's statements, the record is clear that HTD and MKTX never reached an understanding to prorate the Cash Top-Up Threshold.

[103] *See* note 58, *supra*.

Pintoff) testified at trial, the parties never discussed prorating the Cash Top-Up Threshold.[104] Instead, as HTD's Outside Counsel reportedly stated, "everyone missed" the issue.[105] There could be "no meeting of the minds about how the [Cash Top-Up Threshold] would operate" with the prorated system license fee targets because the parties never discussed the issue. *Glidepath*, 2018 WL 2670724, at *14.

Only after the First Earnout Calculation Period was nearly over did HTD assert that the Cash Top-Up Threshold should have been prorated,[106] but HTD reached that view months *after* the parties executed the Amendment, and it therefore does not support a specific prior understanding *at the time the Amendment was signed*. *See Jeremy Paradise Dynasty Tr.*, 2023 WL 1241903, at *14 (explaining that the relevant inquiry is the parties' "intent at the time of the [contract]'s formation"). "Absent evidence that the parties reached a meeting of the minds, there is no prior understanding for the court to enforce." *Glidepath*, 2018 WL 2670724, at *14.

---

[104] *See* note 57, *supra*; PTO ¶¶ 6–9.

[105] JX 182 at 1.

[106] *See* pp. 22–25, *supra*. In fact, in September 2021, before HTD asserted that the Cash Top-Up Threshold was prorated, Purpora told HTD employees that the Cash Top-Up Threshold was $2,750,000. JX 101 at 1. Purpora began telling HTD employees that the Cash Top-Up Threshold was $2,682,000 in December, but he could not explain why he did so. *See* pp. 22, *supra*.

Instead of showing that the parties reached a prior understanding about a particular deal term, HTD's arguments at most suggest that if the parties had thought to prorate the Cash Top-Up Threshold, they might have agreed to do so.[107] For instance, HTD argues that when the parties negotiated the MIPA, they "intended for the cash top-up option threshold and System License Fee Earnout Payment targets to match."[108] HTD explains that in the MIPA, the Cash Top-Up Threshold—"equal to or greater than $2,750,000, but less than $3,250,000"[109]—corresponds to the $2,750,000 and $3,250,000 System License Fee Earnout Payment targets before they prorated in the Amendment.[110] When negotiating the MIPA, the parties agreed that HTD could pay no more than $500,000 in cash to reach the $3,250,000 maximum earnout target, and arrived at a Cash Top-Up Threshold of $2,750,000 because it is

---

[107] *See* POB at 21 (arguing that HTD's Outside Counsel "negligently missed prorating the top-up by not reviewing and scrubbing the entire MIPA agreement"); *id.* at 47 (arguing that HTD's Outside Counsel "overlook[ed] prorating the Cash Top Up Option earnout target"); *id.* at 48 ("The HTD transactional lawyers' testimony establishes that they completely overlooked or ignored the significant impact to their client of not equally prorating the cash top-up target . . . ."). That argument sounds in the implied covenant of good faith and fair dealing, a doctrine Delaware courts have described as "quasi-reformation." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). HTD has not asserted a claim under the implied covenant, nor could it, since the MIPA expressly addresses the Cash Top-Up Threshold.

[108] POB at 18.

[109] MIPA § 1.5(e)(i).

[110] *Id.* § 10.1 (definition of "System License Fee Earnout Payment").

$500,000 less than $3,250,000.[111]  But the evidence does not clearly show that the parties had a specific prior understanding that the Cash Top-Up Threshold would always match the System License Fee Earnout Payment targets, even if those earnout targets changed; as DeLise testified at trial, the two provisions, though related, are "two independent concepts."[112]  And, even assuming the parties would have agreed to prorate the Cash Top-Up Threshold to match the System License Fee Earnout Payment targets if they had thought of it, the fact remains that the parties never thought about, and therefore never agreed to, that term.  "Clear and convincing evidence does not show otherwise."  *Jeremy Paradise Dynasty Tr.*, 2023 WL 1241903, at *14.

In arguing that the "Cash Top-Up Option" and "System License Fee Earnout Payment" are "inextricably linked[,]" HTD points out that both definitions incorporate many of the same defined terms.[113]  HTD also notes that when the parties exchanged drafts of the MIPA during negotiations, they placed the earnout targets and the Cash Top-Up Option in the same rider.[114]  Those arguments show the obvious—that the earnout targets and the Cash Top-Up Option are part of the overall

---

[111] *See* JX 16; JX 19; JX 251.

[112] Tr. (DeLise) 848:20–24.

[113] POB at 17, 25.

[114] JX 23 at 2, 93.

34

earnout structure—but they do not demonstrate that the parties reached a specific understanding that the Cash Top-Up Threshold would correspond with the system license fee earnout targets.

HTD also argues that the "parties always intended the last-minute edits to [the Amendment] to be purely ministerial and mechanical in nature" and did not intend to change the economics of the deal.[115] When MKTX offered alternatives to address the mid-month closing, MKTX did not tell HTD that "there would be any penalty or material change to the deal terms in connection with its proration proposal."[116] This too amounts to an argument that if HTD had thought about prorating the Cash Top-Up Threshold, it would have pushed for that term. But, again, neither party considered the Cash Top-Up Threshold when they signed the Amendment.[117]

Finally, HTD contends that MKTX realized the Amendment failed to prorate the Cash Top-Up Threshold but nevertheless "remained silent[,]"[118] suggesting that MKTX "consciously decided not to specify a carveout of the cash top-up from

---

[115] POB at 17; *see also id.* at 26–27 (arguing that "if HTD had only 356 days rather than the full calendar year of 365 days contemplated under the MIPA to meet an unprorated $2.75 Million earnout target that this imposed a greater economic burden on HTD"); *id.* at 31–37.

[116] *Id.* at 34.

[117] Tr. (DeLise) 855:1–11 ("Q. But you didn't straightforwardly propose to Hartfield in your easy fix proposal that the cash top-up was going to be excluded from the proration; did you? A. I did not . . . I was not thinking about, I wasn't focused on the cash top-up.").

[118] POB at 41.

proration because it knew HTD would never accept this as an unacceptable rewriting of the economics of the deal."[119] The record does not support that argument; HTD's reformation claim therefore fails for the additional reason that MKTX did not know of HTD's purported mistake when the parties executed the Amendment. To argue otherwise, HTD cites an April 15, 2022 communication in which Tagg Martin expressed "shock[]" that HTD was not "fighting [MKTX] more" over the Cash Top-Up Threshold.[120] That communication does not suggest MKTX was aware of a mistake when the parties signed the Amendment. HTD also cites a December 2, 2022 email in which Richard Schiffman remarked that HTD had made "a very costly and unfortunate mistake,"[121] as well as Chris Concannon's testimony that HTD made a "costly mistake" by "failing to read the final draft of the MIPA [as amended] carefully, and failing to catch the drafting error before signing[.]"[122] That evidence does not clearly demonstrate that MKTX knew of any mistake when the Amendment was signed; it suggests instead that MKTX later came to learn that HTD had failed to negotiate a deal term that it later realized it wanted. Nor are MKTX's "proposals to make HTD whole by requiring it to provide additional services to re-earn the

---

[119] *Id.* at 40.

[120] *Id.* at 41–42 (citing JX 132 at 2).

[121] *Id.* at 41 (citing JX 176 at 1).

[122] *Id.* at 42 (citing Pl.'s Notice of Lodging of Dep. Tr., Ex. 2 at 218:3–219:11, Dkt. 124).

earnout compensation"[123] probative of MKTX's knowledge at the time the Amendment was signed. MKTX was willing to consider a new earnout structure because HTD was an important client of the MuniBrokers Platform, but the record is clear that MKTX did not agree with HTD's position.[124]

For the reasons explained above, HTD has failed to demonstrate its entitlement to reformation by clear and convincing evidence. Having prevailed on its defense, MKTX seeks its reasonable fees and costs in connection with this litigation. Section 11.10 of the MIPA provides that:

> In the event of any litigation, action or proceeding brought by a Party to enforce any provision of this Agreement, the prevailing Party in such litigation, action or proceeding shall be entitled to recover from the non-prevailing Party, and the non-prevailing Party shall promptly reimburse the prevailing Party for, the reasonable out-of-pocket fees, costs and expenses (including reasonable and documented attorney's fees and expenses) incurred by the prevailing Party and its Affiliates in connection therewith.[125]

As the prevailing party, MKTX is entitled to recover its reasonable fees, costs, and expenses, including reasonable attorney's fees.

---

[123] *Id.*

[124] *See, e.g.*, JX 176 at 1; JX 178 at 1.

[125] MIPA § 11.10.

## III.  CONCLUSION

For the reasons explained above, judgment is entered for MKTX.  HTD's claim for reformation is denied.  The parties are directed to meet and confer on a proposed form of order to implement the rulings in this memorandum opinion.